THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MELVIN WILSON, Defendant-Appellant.

Third District   No. 3—85—0590

Opinion filed November 6, 1986.

Robert Agostinelli, of State Appellate Defender's Office, of Ottawa, and Gary R. Peterson, of State Appellate Defender's Office, of Springfield, for appellant.

Edward Petka, State's Attorney, of Joliet (Gary F. Gnidovec, of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE HEIPLE delivered the opinion of the court:

Melvin Wilson and Clifford Horne were charged by indictment with the murders of Ralph Dixon and Crystal Knight. Codefendant Horne entered a negotiated plea wherein he received concurrent 25-year sentences of imprisonment for murder and rape in exchange for his testimony against the defendant, Wilson. Following a jury trial, Wilson was found guilty of both murders. We reverse and remand for a new trial.

At Wilson's trial, codefendant Horne testified that on the evening of August 19, 1983, he and the defendant, Wilson, formulated a plan to rob a drug trafficker by the name of James Reynolds. According to Horne, he and Wilson planned to contact Reynolds through Ralph Dixon, who was also a drug dealer. Pursuant to the plan, Horne telephoned Dixon and requested four ounces of cocaine. Dixon informed him that he could have the cocaine for him within 15 to 20 minutes after he got there. Horne and Wilson subsequently arrived at Dixon's apartment at approximately 11 p.m. After receiving Horne's assurance that Wilson was not a police officer, Dixon stated that he had four ounces of cocaine available there. Horne replied that he and Wilson would go out to the car and get the money.

Horne continued by stating that he and Wilson went to the car and returned to the apartment bearing guns and a pair of handcuffs. They then exhibited their guns to Dixon and handcuffed him. With Dixon in tow, they found Dixon's girlfriend, Crystal Knight, in the

rear bedroom, taped her mouth and eyes, and tied her hands and feet. Horne then returned to the kitchen area with Dixon and began asking him about Reynold's whereabouts. Dixon told him that Reynolds was out of town. Horne then began searching the apartment for more cocaine.

Horne next testified that he saw Wilson carrying a portable television out of the bedroom. Horne then went to the bedroom himself and stated that he raped Crystal Knight. Thereafter, he returned to the kitchen and Wilson went back to the bedroom. According to Horne, Wilson subsequently emerged from the bedroom with a knife and a bloody towel and stated that he killed Crystal Knight. Finally, Horne testified that he saw Wilson stab Dixon three or four times.

On cross-examination Horne testified that while he was being interrogated in this matter the police told him that Wilson was blaming the murders on him. Horne then left the interrogation room and later called Rose Marie Williams, Wilson's fiancee, in Kenosha, Wisconsin, to see if the police were telling him the truth. She supposedly said, "You know better than that."

The State offered further evidence that approximately 55 suitable latent prints were recovered from Dixon's apartment. Of those 55 prints, 20 were matched to Horne, two were matched to Wilson, and at least two were matched to James Reynolds. Dixon's and Knight's prints were also identified, and others were unidentified. The two prints matched to the defendant were lifted from a portable television that was found sitting on the living room floor and was shown to have been moved from the bedroom. Other State's evidence showed that the bodies were discovered on August 21, 1983, that both died from exsanguination, and that the victims were likely killed by the same person. Wilson was arrested in Kenosha, Wisconsin, on July 23, 1984. At that time he was living with his fiancee, Rose Marie Williams. Initially, Wilson gave the police an alias name, but later acknowledged that he was Melvin Wilson. While in jail, Wilson made a telephone call to Horne.

Finally, the State offered the evidence of Daniel Stohr, Horne's attorney. Attorney Stohr testified that Horne told him that he was present when the crimes were committed, that he did not commit the murders, and that Melvin Wilson committed the murders. This conversation was had before the State negotiated a plea with Horne for his testimony in this matter.

Wilson, testifying on his own behalf, denied any participation in the offenses charged. He further stated that he had been in Dixon's apartment on one occasion in early August 1983, and although he did

not remember touching the television then, he said that "I did move it one time or another." The defendant denied being anything more than an acquaintance of Horne and offered explanations for leaving Illinois and using an alias name.

The defendant argues that he was denied a fair trial when the trial court prevented the defense from attempting to prove that someone other than the defendant committed the murders. The evidence at trial established that James Reynolds' fingerprints were found at the scene of the crime. Evidence also established that James Reynolds was arrested the day after the bodies were discovered while using the victim's Corvette. Nevertheless, the defendant was not allowed to admit evidence that Reynolds had been involved in a violent argument with the victims just hours before their murders.

In its offer of proof regarding the argument, the defense presented the testimony of James Reynolds, Karen Bulger, and Pat Bulger. James Reynolds testified that he was at the victim's apartment on Thursday, August 18, the day before the murders, making a drug delivery. He stated that he arrived at the apartment complex in a black van with Florida plates. His bullterrier was with him. He continued by saying that he went into Dixon's apartment, delivered four ounces of cocaine worth $8,000, and left in Dixon's Corvette. He denied having an argument with the victims.

Karen and Pat Bulger were neighbors of the victims. Karen Bulger stated that on the day of the murders, Friday, August 19, she was out on her balcony and observed a black van with Florida plates pull into the parking lot. She then observed a man get out and walk what she described as a huge, muscular dog. She went back into the house and came out onto the balcony because of the yelling and screaming she heard. Mrs. Bulger described the scene as follows:

> "[The victim, Dixon, and James Reynolds] were threatening each other, and they were—there was a lot of swearing which I won't say the words, F, SOB, words, lots of things I wouldn't repeat, and that's the sort of thing, then each one of them several times threatened to kill the other one.
>
> * * *
>
> They were—they were so mad that at that time I thought that someone was going to pull a gun on the other one. I thought that much was an angry conversation. I was scared something was going to come of it. [James Reynolds] was going to charge at him. He was going to charge in the building and go after him. It was very violent."

Mrs. Bulger went back into her apartment when James Reynolds saw

her watching the argument. Pat Bulger related virtually an identical account of the argument in the offer of proof.

██ It has been long recognized that one accused of a crime may prove any fact or circumstance tending to show that someone else committed the crime. (*People v. Nitti* (1924), 312 Ill. 73.) Such evidence may be excluded on the grounds of irrelevancy if it is too remote in time (*People v. Ward* (1984), 101 Ill. 2d 443) or too speculative in nature (*People v. Dukett* (1974), 56 Ill. 2d 432).

██ The State argues on appeal that the testimony of the Bulgers was properly excluded because it was irrelevant and speculative. We disagree. First, the evidence is not irrelevant because of remoteness in time. In *People v. Nitti* (1924), 312 Ill. 73, the Illinois Supreme Court held that an argument between the victim and someone other than the defendant two weeks before the victim's death was not too remote in time. Certainly, an argument on the day before, or the day of, the actual murders is not too remote. Neither is the evidence merely speculative. It is coupled with other factors indicating a connection between Reynolds and the crime, such as the fingerprints and the fact that Reynolds had the victim's car in his possession the day after the bodies were discovered. Thus, the proffered evidence was both relevant and material. Its sufficiency, of course, was a matter for the jury as trier of fact. The trial court erred in refusing to admit this evidence. We, accordingly, reverse and remand for a new trial.

██ Since a retrial is in order, we proceed to a resolution of the remaining issues in the event they may recur. The defendant takes issue with certain remarks made by the prosecutor during the State's closing argument. Prior to the defendant's trial, the judge correctly ruled for reasons of hearsay that the defendant was precluded from testifying that in early August of 1983 he helped a man named Hicks move some furniture, including a portable television, which Hicks said belonged to Dixon. The defendant's subsequent testimony was as follows:

"Q. You have heard the testimony in this court here, relative to your fingerprints being on the TV set in the apartment, is that correct?

A. Yes, it is.

Q. In the early part of August, 1983, you were at an apartment with Ralph Dixon, did you ever touch the television?

A. I don't remember touching the television set at that particular time. No, I don't. I just—as I stated, I went to the washroom. There is a possibility I could have touched the television. I did move it one time or another."

In closing, the prosecutor argued:

"Regarding the television set. That's the heart of the case. I'll admit it to you. Without that fingerprint on the television set, [the defendant] would never have been arrested, first of all.

\* \* \*

Now, [defense counsel] wants you to think, 'Well, hey, somehow, somewhere, someplace, sometime he moved Ralph's TV set and just threw that out.'

Ask yourself with such an important, such a damning piece of evidence against him, why didn't he explain where this somehow, somewhere, someplace, he merely threw it out as the last statement out of his mouth on their examination and it was an answer that had nothing to do with the question proposed.

But he had to throw that out, because he had to somehow explain that he touched that TV."

The State argues that these comments were proper because the pretrial ruling did not completely prohibit the defendant from attempting to explain away the State's evidence regarding his fingerprints. We agree. The trial court had ruled that the "entire line of questioning" regarding the earlier moving of the television was barred. When the defendant improperly volunteered that, "I did move it [the television] at one time or another," he invited the prosecutor's comments.

■■ The defendant next argues on appeal that the trial judge's decision to *sua sponte* omit part of an instruction was improper. An instruction conference was held and the parties agreed that both paragraphs of Illinois Pattern Jury Instruction, Criminal, No. 3.02 (2d ed. 1971) (hereinafter IPI Criminal 2d) regarding circumstantial evidence would be given. It reads as follows:

"3.02 Definition of Circumstantial Evidence

Circumstantial evidence is the proof of facts or circumstances which give rise to a reasonable inference of other facts which tend to show the guilt or innocence of [(the)(a)] defendant. Circumstantial evidence should be considered by you together with all the other evidence in the case in arriving at your verdict.

You should not find the defendant guilty unless the facts or circumstances proved exclude every reasonable theory of innocence.

COMMITTEE NOTE

\* \* \*

The second paragraph should be given only when the proof of guilt is entirely circumstantial. *People v. French*, 59 Ill. App.

3d 353, 375 N.E.2d 502, 16 Ill. Dec. 629 (1st Dist. 1978); *People v. Holt*, 7 Ill. App. 3d 646, 288 N.E.2d 245 (3d Dist. 1972)." (IPI Criminal 2d No. 3.02.)

Defense counsel relied somewhat on the second paragraph of the instruction in his closing argument. After closing arguments the judge decided that the second paragraph was improper and informed the parties that he would not give it. The defense claims that his motion for mistrial should have been granted and that the action of the trial judge was reversible error. The trial judge was correct in realizing that the second paragraph of the instruction need only be given where all of the evidence against the defendant is circumstantial. (IPI Criminal, 2d No. 3.02, Committee Note.) Here, Horne's testimony was direct evidence. It is the duty of the trial judge to correctly instruct the jury as to the law (*People v. Grant* (1981), 101 Ill. App. 3d 43, 427 N.E.2d 810), and since we find no prejudicial effect resulting from the judge's decision to omit the instruction, no error was committed.

■ The next issue on review is whether the trial judge properly declined to allow defense counsel to recall codefendant Horne in his case in chief solely to impeach him on a collateral matter. Horne testified on direct examination by the State that he raped Crystal Knight. A later State's witness, Dr. Shalgos, testified that no vaginal trauma was evident on Knight. Following the State's case in chief, defense counsel attempted to recall the codefendant and cross-examine him about the rape. The trial judge did not allow defense counsel to do so. The defendant argues that this denied his right to confront his accuser and prevented the defense from exploring the possibility that the codefendant was lying. We disagree. It is within the discretion of the trial judge to permit or deny a party's request to recall a witness for further cross-examination. (*People v. Peter* (1973), 55 Ill. 2d 443.) The defense counsel was allowed a thorough and unrestricted cross-examination of the codefendant during the State's case in chief. Defense counsel's argument that Dr. Shalgos' testimony was a surprise is unfounded since counsel had the doctor's autopsy report, which contained the fact of lack of vaginal trauma, at his disposal long before the doctor testified. Furthermore, lack of physical injury to a victim's body does not necessarily prove that no rape occurred. (*People v. Patterson* (1980), 90 Ill. App. 3d 775, 413 N.E.2d 1371.) Therefore, impeachment on this point would have been fruitless. There was no abuse of discretion in denying defense counsel's request to recall the codefendant.

■ Wilson also questions whether it was improper for the State to mention in closing that he had failed to call a witness to rebut part

of the State's evidence. The State attempted to establish during the course of the trial that codefendant Horne and defendant Wilson were friends. To do so, the State showed that, immediately after being informed by the police that Wilson was blaming him for the murders of Dixon and Knight, Horne telephoned Wilson's fiancee, Rose Marie Williams, to see if the police were telling him the truth. The State argued in closing that Horne would not have known to call Ms. Williams unless the two were good friends. The State went on to argue that the testimony regarding the phone call was unrebutted, even though Ms. Williams had been available and in the courtroom during part of the trial. The defense objected, noting that it is improper for the prosecutor to comment on a defendant's failure to present witnesses when such witnesses are equally accessible to both parties. The defense correctly points out the general rule. However, it has also been held that a witness is not equally accessible to a party if it is likely that the witness would be biased against that party. (*People v. Bianchi* (1981), 96 Ill. App. 3d 113, 420 N.E.2d 1187.) Since Ms. Williams was likely biased in favor of the defendant, she was not equally accessible to the prosecution, and thus the comment by the prosecutor was proper.

The defendant's final argument on appeal is that the recent decision of *Batson v. Kentucky* (1986), 476 U.S. ___, 90 L. Ed. 2d 69, 106 S. Ct. 1712, requires that this case be remanded for a determination of whether the State's exclusion of blacks from the jury was racially motivated. Since a retrial is in order, the issue is obviated. The new jury will be selected under the mandates of *Batson*.

We reverse the judgment of the circuit court of Will County and remand for a new trial.

Reversed and remanded.

SCOTT, P.J., and STOUDER, J., concur.