THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
OSBORNE ALEXANDER, Defendant-Appellant.

First District (6th Division)   No. 1—86—3611

Opinion filed June 16, 1989.

Michael J. Pelletier and Leia M. Norton, both of State Appellate Defender's Office, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, James E. Fitzgerald, and Christine Perille, Assistant State's Attorneys, of counsel), for the People.

JUSTICE QUINLAN delivered the opinion of the court:

The defendant, Osborne Alexander, was arrested and charged by indictment with the murder and armed robbery of Michael Winfield. Following a jury trial in the circuit court of Cook County, the defendant was found guilty and sentenced to 40 years in the Illinois Department of Corrections. The defendant has appealed his conviction to this court, asking that this court reverse his conviction and order a new trial.

On March 3, 1985, Michael Winfield, a Checker Cab driver, was found shot to death in his cab in the 7300 block of South Clyde in Chicago. Chicago police officer Phyllis Stewart was called to the scene and discovered the cab wedged between two cars, with its motor still running, and the driver slumped behind the wheel of the car. The cab's fare box was still on and registered $3.60, plus 50 cents in extras. Upon investigation, neighborhood residents gave a description of the offender as a male black, approximately 6 feet tall. Later, the defendant, Osborne Alexander, was arrested and charged with the murder and armed robbery of Winfield.

At defendant's trial, the State's chief witness was Claude Young. Young admitted that he was under indictment for 10 armed robberies and that the State had agreed to recommend a maximum sentence of 15 years on those robberies in return for his testimony. He also admitted that he had previously been convicted of voluntary manslaughter. In his testimony, Young stated that he was at home on March 3, 1985, at 3 a.m., watching television in his second-floor apartment, when he heard a gunshot, which was followed by the sound of crashing automobiles. He then heard someone banging on the window of the first floor of the building. Young went downstairs and saw the defendant, Osborne Alexander, and Jerry Polk, who lived on the first floor of Young's building, standing together and talking. Young said the defendant had a .38 caliber gun with him, which Young said he knew was the defendant's gun. Young further testified that he noticed blood on the sleeve of the defendant's coat.

Young additionally testified that the defendant told him at that time that the defendant and his wife had been at the Jedi Lounge and had taken a cab home. He said the defendant also told him he had instructed the cab driver to drop his wife off at home and then drive him to 73rd and Clyde. Once the cab driver reached 73rd and Clyde, the defendant stated that he pulled out his gun and demanded the cab driver's money. The cab driver, the defendant said, refused to give him any money and turned around to hit the defendant in the face. Young stated that the defendant then shot the cab driver, jumped out of the cab, and took the cab driver's money from his pockets, along with some

pornographic pictures that were on the front seat of the cab, and ran to Young's building, which was just down the alley from 73rd and Clyde.

Young said that the defendant initially wanted to escape through the back of Young's building, but decided to wait when he saw that the police had arrived. The defendant, Young and Polk then went down to Polk's apartment. At one point, Polk went to the defendant's house and brought back a change of clothes for him. Once the police were gone, the defendant changed his clothes, gave his gun to Young, and left. Around noon that same day, Young returned the defendant's clothes and gun to him. Several days later, the defendant gave the gun back to Young and asked Young to sell it. Young then sold the gun to a bootlegger.

Later, Young said, on April 8, 1985, he was arrested on an unrelated charge, and after talking with the police officers, agreed to take them to the bootlegger to retrieve the defendant's gun. The bootlegger had sold the gun, but was able to recover it. Thereafter, the gun was turned over to the police.

Robert Loeb next testified that he was an assistant State's Attorney and on April 8, 1985, was assigned to the felony review unit of the State's Attorney's office. On April 8, he was called to the police station to talk with the defendant concerning the murder of Winfield. The defendant was not handcuffed and appeared alert and composed. Loeb introduced himself to the defendant, explained that he was working with the police, and advised the defendant of his *Miranda* rights. Loeb talked with the defendant for approximately 45 minutes. Loeb then asked the defendant if he would go through the same statement again in front of a court reporter. The defendant refused, but agreed to sign a typed statement of what he had just said.

Loeb then typed a summary of the defendant's statement and read the statement to the defendant. Loeb read the statement a second time and the defendant pointed out two mistakes. Loeb then wrote in the corrections that the defendant told him to make and the defendant initialled those corrections. On cross-examination, Loeb said that the defendant had never actually signed the typed statement and had never admitted that he shot Winfield, but instead said that a man named James Grace had done the shooting. Loeb also said that he saw the defendant's wife at the police station, but that she was not in custody or restrained in any way.

The defendant's typed statement was then read to the jury. In his statement, the defendant said that James Grace had dropped the defendant and his wife, Lydia, off at the Jedi Lounge at 11 p.m. on

March 2, 1985. Defendant and Lydia left the Jedi around 1:30 a.m. (now March 3) and took a cab home. The cab dropped Lydia off, and defendant then told the cab driver to pick Grace up at the P & J Liquor store. After picking Grace up, the defendant had the cab driver take them to "Catman's" to buy cocaine. The defendant went up to Catman's and left Grace in the cab. The defendant did not want to take his gun to Catman's, so he left it with Grace. Defendant then returned to the cab and sat in the front seat. When the cab reached the 7300 block of South Clyde, Grace pulled out defendant's gun. The cab driver tried to hit Grace, and Grace shot him. The cab then hit a parked car. Grace jumped out of the cab and defendant took $30 from the driver's pocket, and then he also jumped out of the cab. The defendant ran to Young's house. Young went to defendant's house and brought a change of clothes back for the defendant. Young later sold defendant's gun to a bootlegger.

The defense next presented its case and the defendant testified on his own behalf. The defendant testified that he and his wife went to the Jedi Lounge on March 2, 1985, at 10 p.m. They left at 3 a.m., March 3, and took a cab home. On the way home, defendant and his wife had an argument because the defendant had wanted to stay at the Jedi Lounge. When the cab driver arrived at the defendant's home, defendant's wife got out of the cab and the defendant paid the driver $7. Defendant then told the driver to wait because he did not want to go home yet. He got back in the cab and told the driver to take him back to the Jedi. When he did so, the driver started the cab's meter again. On the way back to the Jedi, the defendant told the driver to stop at the P & J Liquor store so he could get some cigarettes. The cab waited while the defendant went into the liquor store. As the defendant was walking into the liquor store, he saw Grace and had a brief conversation with him. When the defendant came out of the store, both the cab and Grace were gone. The defendant went into a nearby bar for a few drinks and then walked home, arriving home around 4:30 a.m.

Later that day, around 3 or 4 p.m., Grace and Young came over to defendant's apartment and told him to turn on the television news. The defendant sent his wife into the kitchen while he had a conversation with Grace and Young. When the television news reported the story of Winfield's murder, Grace told the defendant that the victim was the driver of the cab that the defendant had been in the night before. Grace told the defendant that he got into the cab when the defendant went into the liquor store and that he had killed the cab driver. Young and Grace threatened the defendant and his wife when the defendant said he was going to call the police.

On April 7, 1985, the defendant was arrested and was informed that Grace told the police that the defendant had murdered Winfield. The defendant claimed that he told the arresting officers the same story that he had just told on direct examination, but that the detectives told him that his story was a "bunch of bullshit" and that he should remember that the officers also had his wife in custody and could charge her with murder. The detectives then told the defendant what to say and this version was put into the statement that Loeb typed. Defendant testified that the entire time he was being interrogated, he was in handcuffs. At trial, the defendant said that the statement Loeb typed was a lie and that he had never signed it because it was not true. The defendant also said that Young's testimony on the stand was fabricated and that the gun used to kill Winfield was not his. The defendant admitted that he had been convicted of armed robbery in Illinois. He also said that he was 6 feet 8 inches tall and he estimated that Grace was 5 feet 11 inches tall. The defense then rested.

The State presented a rebuttal witness and also offered into evidence an abstract of a judgment from California which reflected that the defendant had been convicted of voluntary manslaughter in California. The defendant then testified in surrebuttal and explained that the voluntary manslaughter conviction was based on a homicide that he committed when he was acting in self-defense. After the defendant's testimony on surrebuttal, the trial judge gave the jury its instructions on the law, which were followed by closing arguments. As noted, the defendant was found guilty and sentenced to 30 years of imprisonment. The defendant raises three issues on appeal.

Defendant's first issue on appeal is that the trial court committed reversible error when it allowed the State to impeach his testimony with evidence of a voluntary manslaughter conviction from California, to which he had entered a plea of *nolo contendere*. Defendant argues that according to the Illinois Supreme Court's decision in *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695, a plea of *nolo contendere* is not admissible to impeach a defendant's credibility. In addition, the defendant contends that his credibility, as opposed to the credibility of Claude Young, was crucial at his trial and thus the evidence of his prior homicide most likely had a negative effect on the jury's evaluation of his testimony. Finally, the defendant admits that he also failed to raise this issue in his post-trial motion, but asks this court to consider the issue nonetheless under Illinois Supreme Court Rule 615(a), which allows a reviewing court to consider an issue not raised in the trial court if that issue involves a plain error affecting substantial rights. 107 Ill. 2d R. 615.

The State argues that the defendant has waived this issue upon review because, in addition to the fact that he did not raise the issue in his post-trial motion, his only objection at trial to the admission of his prior homicide was that the document showing his California conviction was an abstract of judgment and not a certified copy of the conviction. Alternatively, the State contends that the defendant's prior homicide was properly admitted at trial because it would have been admissible in California to impeach the defendant, as well as in the Federal courts, and, consequently, Illinois should also allow use of the conviction. The State also argues that any error here was, in any event, harmless and did not rise to the level of reversible error.

In *People v. Montgomery* (1971), 47 Ill. 2d 506, 516, 368 N.E.2d 695, our supreme court adopted proposed Federal Rule of Evidence 609, which provided at that time that "for the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime, except on a plea of *nolo contendere*, is admissible." Subsequently, however, the version of Rule 609 which was eventually adopted deleted several parts of the proposed rule, including the phrase "except on a plea of *nolo contendere*." Nonetheless, in *People v. Yost* (1980), 78 Ill. 2d 292, 399 N.E.2d 1283, the Illinois Supreme Court said that the standards set forth in *Montgomery* for impeachment would continue to apply in Illinois and would not change merely to correspond to changes in Federal Rule 609. At issue in *Yost* was a provision in the proposed rule at the time of the *Montgomery* case which gave judges the final discretion to allow or deny impeachment by evidence of certain convictions. This provision has also been deleted in the rule's final Federal form. *Yost*, 78 Ill. 2d 292, 399 N.E.2d 1283.

██ ▌ We have found no Illinois case specifically addressing the issue of whether a felony conviction based on a *nolo contendere* plea may be used as impeachment evidence, possibly because Illinois does not recognize the *nolo contendere* plea. (*In re Eaton* (1958), 14 Ill. 2d 338, 341, 152 N.E.2d 850, 851.) We do not need, however, to decide whether a felony conviction based on a *nolo contendere* plea can be used for impeachment, because we find that the defendant has waived this issue.[1] In order to preserve an issue for review, a defendant must make a specific objection at trial and also raise the issue in a post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124,

---

[1]We note that Illinois courts have long recognized that a conviction results from a *nolo contendere* plea, just as with a guilty plea, and that a defendant does not avoid conviction simply by pleading *nolo contendere* rather than guilty. See *Gerdes v. Edgar* (1986), 148 Ill. App. 3d 646, 648, 499 N.E.2d 1016, 1018.

1130.) Here, the defendant never objected at trial or in his post-trial motion to the admission of the California homicide on the ground that it was based on a *nolo contendere* plea and, thus, we must find that he has waived the issue.

■ In addition, it was proper for the trial court to allow this prior homicide of the defendant to be used for impeachment here. Under *Montgomery*, even if a prior conviction meets the standards of the proposed Rule 609, the final decision to admit or refuse to admit the conviction is committed to the trial court's discretion and the trial court must then balance the probative value of the prior conviction against its prejudicial effect. (*Montgomery*, 47 Ill. 2d at 516, 268 N.E.2d at 698.) Here, there is no support for defendant's contention that the admission of the California homicide so prejudiced his case that it caused the jury to automatically conclude that Claude Young was the more credible witness.

■ Here, although the State introduced the prior conviction into evidence, the State did not question the defendant concerning this conviction. It was defendant's counsel who questioned the defendant about the California homicide and it was the defendant who testified on surrebuttal that he had entered a plea of "no contender [*sic*]" to a charge of "involuntary [*sic*]" manslaughter because this was "the quickest way to get off." The defendant further claimed in his testimony on surrebuttal that the California homicide occurred as a result of self-defense. Inasmuch as the defendant explained this conviction on surrebuttal, any prejudice caused by the conviction was lessened by the fact that the defendant was allowed to give his version of the circumstances surrounding that offense.

Furthermore, it is unlikely that admission of defendant's prior homicide conviction negatively affected the jury's evaluation of the defendant's credibility *vis-a-vis* the credibility of Claude Young, since Young admitted that he had also been convicted of voluntary manslaughter and theft and was under indictment for 10 armed robberies. Finally, we note, as the State observed, the defendant's testimony was the only evidence that the defendant had actually entered a *nolo contendere* plea to the California charge, because the abstract of judgment merely revealed that a plea had been entered. The defendant offered no support for this assertion. Accordingly, we conclude that no error occurred here by the admission of this conviction.

Defendant's next issue on appeal is that the State made several improper comments during its closing argument which, he claims, substantially affected his right to a fair trial, and, thus, he is entitled to a new trial. Specifically, defendant asserts that the State improp-

erly commented on his failure to call his wife, a nonalibi witness, to testify. Because she was equally accessible as a witness to both sides, it was, he says, error for the State to comment on his failure to call her. The defendant also contends that the State improperly commented on a matter not in evidence when the prosecutor said that James Grace must have implicated the defendant in Winfield's murder, as Grace was never called to testify. The defendant further argues that the State improperly told the jury that it could not "create possible scenarios, inconsistent with guilt." These errors were compounded, according to the defendant, because the comments occurred during the State's rebuttal argument and, therefore, could not be responded to by him.

The State's initial response to this argument is that the defendant has again waived this argument on appeal because he failed to object to these comments during trial and in his post-trial motion. Even assuming this issue was not waived, the State says that the comments were not improper. The State argues that it can comment on a defendant's failure to call an alibi witness or a witness that is not equally accessible to it and, even though the defendant's wife was not specifically named as an alibi witness, his wife was clearly not equally accessible to both parties because she would have been biased in favor of the defendant here. In response to defendant's next assertion, the State apparently concedes that its comment concerning Grace was erroneous, but contends that the error was harmless and did not prejudice the defendant. The State further argues that its comment regarding "possible scenarios," when read in context, was, in fact, a proper comment.

■ A prosecutor is given great latitude in this closing argument and may base his argument on the evidence presented or reasonable inferences therefrom. (*People v. Rader* (1988), 178 Ill. App. 3d 453, 465-66, 532 N.E.2d 1365, 1372-72.) In determining whether a prosecutor's remarks constituted reversible error, the test is whether the remarks, when considered in light of all the evidence at trial, materially contributed to the defendant's conviction or, stated otherwise, the jury would have reached a different result had the remarks not been made. *People v. Lasley* (1987), 158 Ill. App. 3d 614, 625-26, 511 N.E.2d 661, 670.

■ ■ Addressing first the defendant's claim that the State improperly commented on his failure to call his wife, a nonalibi witness, to testify, we find that the comment was not erroneous. It is true that the State cannot properly comment on a defendant's failure to call a nonalibi witness when the comment implies that the witness would

have testified unfavorably to the defendant and when that witness is equally accessible to both parties. (*Lasley*, 158 Ill. App. 3d at 632, 511 N.E.2d at 674.) A witness is not considered equally available, however, if the witness would likely be biased against the State. (*People v. Wilson* (1986), 149 Ill. App. 3d 293, 300, 500 N.E.2d 128, 133.) Here, we believe that the defendant's wife was not equally accessible to the State inasmuch as she was likely biased in favor of the defendant. See *People v. Morando* (1988), 169 Ill. App. 3d 716, 523 N.E.2d 1061, 1075 (brother of defendant likely to be biased in favor of defendant and thus not equally accessible to the State); *Wilson*, 149 Ill. App. 3d at 300, 500 N.E.2d at 133 (defendant's fiancee not equally available to State because she is likely biased toward defendant); *People v. Taylor* (1985), 137 Ill. App. 3d 148, 154, 484 N.E.2d 383, 387 (defendant's stepchildren not equally available to State).

■ We also find that the comment concerning Grace was a proper comment. The record reveals that defense counsel, in his closing argument, said "[the defendant] was taken into custody on April 7th when he was told that James Grace had implicated him in a crime." Thus the prosecutor's comment in rebuttal was invited by the defendant's statement in closing argument. A defendant cannot complain of a prosecutor's statements made on rebuttal when defendant's own argument invited those statements. (*Rader*, 178 Ill. App. 3d at 466, 532 N.E.2d at 1372-73.) Additionally, this statement was based on the evidence presented, since the defendant himself testified that Grace implicated him in the murder, and a prosecutor may properly base his closing argument on any evidence presented. *Rader*, 178 Ill. App. 3d at 466, 532 N.E.2d at 1372-73.

■ We also believe that the prosecutor's comment that the jury was "not entitled to create possible scenarios, inconsistent with guilt," if erroneous, did not amount to reversible error. Based on the record here, we cannot say that the jury would have reached a different result even if the remark had not been made. (*Lasley*, 158 Ill. App. 3d at 625-26, 511 N.E.2d at 670.) Therefore, we conclude that any error was harmless.

The defendant's last issue on appeal is that he was deprived of a fair trial and is entitled to a new trial because the trial court gave its instructions to the jury before closing arguments, rather than after closing arguments, as required in the Illinois Code of Criminal Procedure of 1963. (Ill. Rev. Stat. 1987, ch. 38, par. 115—4(i).) The State contends that the defendant has also waived this issue on appeal because he failed to object to the giving of the instructions at trial or in his post-trial motion. However, the State contends that even

if this issue was not waived, there was no error here because the instructions were clear, accurate and complete, and in any event, any error here was harmless and did not rise to the level of reversible error.

This court recently addressed the issue of whether the giving of jury instructions before closing argument amounted to reversible error and concluded that such a procedural error did not require reversal so long as the jury instructions were clear, accurate and complete. (*People v. Fox* (1988), 177 Ill. App. 3d 602, 532 N.E.2d 472.) Here, a review of the record shows that the jury instructions were clear, accurate and complete and the defendant himself does not claim otherwise. Accordingly, in the present case, although the Illinois Code of Criminal Procedure provides for the giving of the jury instructions after closing argument, this error did not rise to the level of reversible error.

For all of the foregoing reasons, the judgment of the circuit court of Cook County is affirmed. Also, pursuant to *People v. Agnew* (1985), 105 Ill. 2d 275, 473 N.E.2d 1319, and *People v. Nicholls* (1978), 71 Ill. 2d 166, 374 N.E.2d 194, we grant the State's request that the defendant be assessed $75 as costs for the State's defending this appeal and incorporate it as part of our judgment.

Affirmed.

EGAN, P.J., and LaPORTA, J., concur.