THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KEVIN ZERNEL, Defendant-Appellant.

First District (5th Division)    No. 1—92—0122

Opinion filed March 31, 1994.

Patrick A. Tuite and Brent D. Stratton, both of Tuite, Stratton & Menaker, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Linda Woloshin, and Catherine Chaskin, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE MURRAY delivered the opinion of the court:

Defendant, Kevin Zernel (Zernel), was charged in a 20-count indictment with aggravated criminal sexual assault, criminal sexual assault, armed violence and aggravated criminal sexual abuse. The charges stemmed from an incident involving a young woman, D.B., which took place on April 15, 1990, in defendant's Berwyn, Illinois, residence. Prior to trial the State nol-prossed all but seven of the charges and, in a jury trial which commenced October 16, 1991, Zernel was tried on six counts of aggravated criminal sexual assault and one count of unlawful restraint. The jury found Zernel guilty on three counts of aggravated criminal sexual assault and not guilty of all other counts. The three convictions were merged and Zernel was sentenced on December 19, 1991, to 28 years' imprisonment on the merged convictions. Zernel filed a post-trial motion for new trial, which was denied, and he then filed a notice of appeal.[1]

On appeal, Zernel contends that he was not proved guilty beyond a reasonable doubt because the verdict returned by the jury was legally inconsistent. Zernel also charges the prosecutor with misconduct and questions the propriety of an instruction given to the jury on aggravated criminal sexual assault. Zernel asks this court to reverse his convictions or, in the alternative, to remand for a new trial. For reasons that follow, we affirm Zernel's conviction and sentence.

At trial the following evidence was presented.

D.B. testified that about 8 p.m. on the evening of April 14, 1990, she went to Slip Shotz, a Berwyn tavern, with a friend, Al Elarde (Elarde). While at this establishment she met Zernel, who apparently had been previously acquainted with Elarde. About 10:30 p.m., D.B., Elarde and Zernel left Slip Shotz together to go to Papa T's for pizza. After Zernel ordered pizza, Elarde asked D.B. if she would drive Zernel to his residence a few blocks away so that Zernel could get $20 and return to Papa T's. Elarde stated that Zernel owed the $20 to him from a previous loan. Based upon assurances from Elarde that

---

[1]The notice of appeal is dated January 6, 1991. However, from the half-sheet it is apparent that notice of appeal was filed January 6, 1992.

Zernel was a "nice guy," D.B. agreed to drive Zernel to his Berwyn apartment.

When they arrived at his apartment, Zernel persuaded D.B. to come inside. Zernel told D.B. that he lived with his mother and that she would enjoy her company. Also, he indicated that his mother would not let him leave again if D.B. didn't come inside with him. Based upon these representations, D.B. consented to accompany Zernel to his apartment. Inside the apartment D.B. met Zernel's mother, who was elderly and appeared confused. D.B. described the mother's conversation as rambling and her manner as nervous. D.B. attempted to converse with her while waiting for Zernel, who now said he couldn't leave because he was waiting for some telephone calls.

After speaking with Zernel's mother for about 20 minutes, D.B. asked Zernel for the $20 so she could leave. In response, Zernel told his mother to go to bed. His mother immediately left the room and then went into a room at the back of the apartment. Zernel then entered his bedroom, which was located just off the kitchen area. From inside his bedroom, Zernel called to D.B., who was preparing to leave. As she stepped through the doorway to his bedroom he grabbed her from behind and held a knife to her throat.

While still holding D.B. in a neckhold, Zernel closed the door to the bedroom. He then released her into the room and told her that she was his hostage and that he would kill her unless she did what he told her to do. According to D.B's testimony, Zernel did not strike her, but frequently grabbed her by the hair to direct her to the location that he wanted. Zernel boasted that he could kill her with his bare hands if he wanted. He also told her that he had a gun, while displaying a dark object that D.B. believed could have been a gun, and told D.B. that he would shoot her in the back if she ran. Finally, Zernel threatened to kill her and come after her family if she did not do as he said.

Subsequently, based upon the threats to her own life and to the lives of her family, D.B. complied when Zernel ordered her to disrobe and submit to various sexual assaults. The sex acts themselves need not be recounted here since they do not impact on the points raised in this appeal. Suffice it to say that D.B.'s testimony amply supported the sexual assault elements of the crimes charged.

After Zernel had gratified himself, he permitted D.B. to dress and leave the apartment, once again threatening to kill her if she told the police. It was about 4:30 a.m. when D.B. drove home, having been in Zernel's apartment for more than four hours. At home, D.B., who was described as hysterical and sobbing, immediately woke her sister and told her what had happened. Although D.B. was frightened

because of the threats Zernel had made, she finally agreed to go to the hospital and to report the incident to the police.

The Berwyn police, upon being notified of the incident by D.B., began an investigation. Using D.B.'s directions to Zernel's apartment, Berwyn police officer Roger Montoro located Zernel and arrested him. A lineup was conducted on the evening of April 15, 1990, at which time D.B. identified Zernel as her attacker.

Officer Volanti, an evidence technician for the Berwyn police, testified that he received certain pieces of evidence, including D.B.'s clothing, Zernel's clothing, and a Vitulo kit for D.B., that he packaged, processed and then delivered to the evidence lab. He also photographed Zernel after his arrest and went to the Zernel apartment, where he gathered more items of evidence, including the bedspread and sheet from Zernel's bed. Volanti testified that he recovered two knives taken from the countertop in the kitchen of Zernel's apartment, but that no knives or guns were found in Zernel's bedroom. The items recovered from the apartment were also packaged, processed and delivered to the lab for testing.

Next, Doctor Jeanne Johnson testified that on April 15, 1990, at about 6 a.m., while working at the La Grange Hospital emergency room, she conducted a physical examination and internal examination on D.B., who came to the hospital and indicated that she had been the victim of a sexual assault. Dr. Johnson collected evidence for a Vitulo kit or "rape kit," which consisted of taking vaginal and oral swabs, blood samples and other physical evidence. Dr. Johnson described D.B. as "upset, scared and crying." She admitted that there was no external evidence of trauma to the vagina and no bruises or marks on D.B., but stated that this was not necessarily inconsistent with a claim of sexual assault.

Finally, Rodney Anderson, who was employed by the Illinois State Police Bureau of Forensic Sciences Laboratory, testified as to various tests he performed on evidence recovered in this case and delivered to him at the police lab by Officer Volanti on April 17, 1990. Anderson was able to state, based upon head and pubic hair samples taken from D.B and Zernel, that some hairs found on D.B.'s clothing were consistent with the standards received from Zernel and that some hairs found on Zernel's clothing and bed linens were consistent with the standards obtained from D.B.

Zernel presented no evidence. After the State rested and closing arguments were made, the jury was instructed by the judge and given verdict forms to complete. The jury found Zernel guilty of three counts of aggravated criminal sexual assault based upon threatening or endangering the life of D.B., in contravention of

section 12—14(a)(3) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 12—14(a)(3)).

Zernel's main issue on appeal is that his convictions for aggravated criminal sexual assault must be reversed because they are legally inconsistent with the jury's acquittal of him on the other three counts of aggravated criminal sexual assault. In order to understand this argument, it will be helpful if we first review the statute defining the offense of aggravated criminal sexual assault and the indictments filed against Zernel in this case.

■ Section 12—14 of the Criminal Code (Ill. Rev. Stat. 1985, ch. 38, par. 12—14) states in pertinent part:

"(a) The accused commits aggravated criminal sexual assault if he or she commits criminal sexual assault and any of the following aggravating circumstances existed during the commission of the offense:

(1) the accused displayed, threatened to use, or used a dangerous weapon or any object fashioned or utilized in such a manner as to lead the victim under the circumstances reasonably to believe it to be a dangerous weapon; or

\* \* \*

(3) the accused acted in such a manner as to threaten or endanger the life of the victim or any other person."

Although sections 12—14(a)(1) and (a)(3) present two distinct aggravating factors, the State merged these two factors in indictments against Zernel. Of the six indictments filed against Zernel charging him with aggravated criminal sexual assault, counts I, II, and III charged a violation of section 12—14(a)(1), stating, "Zernel displayed a dangerous weapon, to wit: a knife." The remaining counts, charging aggravated criminal sexual assault (counts IV, VI, and VIII), charged violations of section 12—14(a)(3), stating, "Zernel acted in such a manner, to wit: displayed a knife as to threaten the life of [D.B.]"

It is Zernel's position that, based upon the indictments, all six counts of aggravated criminal sexual assault required proof of three identical elements: (1) an act of sexual penetration; (2) the use of force or threat of force; and (3) the display of a knife. Counts IV, VI, and VIII merely added a fourth element, *i.e.*, acted in a manner as to threaten life. He argues, therefore, that the jury's acquittal of the charges in counts I, II, and III is legally inconsistent with, and forecloses conviction on, counts IV, VI, and VIII. Zernel concludes that outright reversal of his convictions is required.

Zernel also asks this appellate court to find, for the same reasons, that there was insufficient evidence of his guilt on the three counts of aggravated criminal sexual assault for which he was convicted and

that he was not proved guilty beyond a reasonable doubt as a matter of law.

The State disagrees, arguing that a logical inconsistency, but not a legal one, exists. The State urges this court to uphold the verdicts rendered.

■ In *People v. Frias* (1983), 99 Ill. 2d 193, 457 N.E.2d 1233, the Illinois Supreme Court stated that logically inconsistent verdicts may stand, but legally inconsistent verdicts may not. The court then went on to define legally inconsistent verdicts, quoting *People v. Murray* (1975), 34 Ill. App. 3d 521, 531, 340 N.E.2d 186, 194, as follows:

> " 'Verdicts of guilty of crime A but not guilty of crime B, where both crimes arise out of the set of facts, are legally inconsistent when they necessarily involve the conclusion that the same essential element or elements of each crime were found both to exist and not to exist.' "

Logical inconsistencies, on the other hand, arise when verdicts, though not based upon the same elements, nonetheless involve both the acceptance and rejection of the same theory of the case proposed by the State or the defense. (*People v. Landwer* (1993), 254 Ill. App. 3d 120, 626 N.E.2d 306.) Based upon the above definitions, we find in this case that a logical inconsistency, but not a legal inconsistency, exists. For this reason, we uphold the convictions rendered by the jury.

■ In this case the jury did not find that the element "displayed a knife" both existed and did not exist, as Zernel seems to suggest. This is because the crime for which Zernel was found guilty, *i.e.*, aggravated criminal sexual assault based upon threatening or endangering the life of D.B., does not require proof that Zernel displayed a knife (or any other weapon) as an essential element.

It is important to note that, despite the manner in which the indictment was drafted, the jury was properly instructed in accordance with the wording of the statute. Therefore, it is clear that the jury could have found Zernel guilty based upon a finding that he committed an act of sexual penetration using force or the threat of force, while threatening the life of D.B. and/or her family. It was not necessary for the jury to have found that Zernel also displayed a weapon. Thus, the jury's acquittal of Zernel on the counts charging the display or use of a weapon as an essential element does not *necessarily* negate the finding of guilty on the other counts alleging the alternate aggravating factor.

It would seem that the indictments were poorly drafted, unnecessarily causing confusion by adding the verbiage "displayed a knife" as part of the counts charging violations of section 12—14(a)(3), which

does not require display of a weapon as an element. Apparently, the indictments represented the State's theory of the case, which the jury rejected, giving rise to a logical inconsistency, but not a legal one. Since there was ample evidence that both of the aggravating factors existed, the jury's acceptance of one aggravating factor over the other may not be disturbed.

■ Zernel also contends that the convictions must be reversed because the jury was improperly instructed. It is Zernel's theory that the instructions, regardless of the statutory elements of the crime charged, should have mirrored the indictment so that the State was obligated to prove that he threatened or endangered D.B. *by the display of a knife.* However, as stated earlier, although this was apparently the State's theory of the case, it is not a proper statement of the law. It is clear that aggravated criminal sexual assault can be proven by evidence that the accused *either* displayed a weapon *or* threatened or endangered the life of the victim. The inclusion of "display of a knife" in the indictments charging violations of section 12—14(a)(3) must be deemed mere surplusage and not indicative of the elements of the crime that had to be proven. (See *People v. Winfield* (1987), 160 Ill. App. 3d 983, 513 N.E.2d 1032; *People v. Tanner* (1986), 142 Ill. App. 3d 165, 491 N.E.2d 776.) *People v. Claybourn* (1991), 221 Ill. App. 3d 1071, 582 N.E.2d 1347, cited by Zernel, is distinguishable since in that case *no* aggravating factor was included in the instruction.

■ Zernel's last argument is that he was denied a fair trial by prosecutorial misconduct throughout the trial. The complained-of comments fall into three categories: (1) comments on Zernel's failure to call his mother as a witness, (2) reference to D.B. as a "victim," and (3) personal attacks on Zernel and his counsel. We have reviewed all of the complained-of comments and find no reversible error. Although a few remarks may have crossed the line of civility, in light of all of the evidence presented in this case, any error was harmless beyond a reasonable doubt.

First of all, it was not reversible error for the prosecutor to have commented on the fact that Zernel's mother did not testify. The general rule is that it is improper for the State to comment on a defendant's failure to present a nonalibi witness when the witness is equally accessible to both parties. (*People v. Alexander* (1989), 184 Ill. App. 3d 855, 540 N.E.2d 949; *People v. Doe* (1988), 175 Ill. App. 3d 371, 529 N.E.2d 980.) A witness is not considered equally accessible, however, if the witness, due to a familial relationship to the defendant, would likely be biased against the State. (*Alexander*, 184 Ill. App. 3d at 864.) The State may then properly comment on the

absence of the witness, especially where the witness could shed light on the accused's theory of defense. *People v. Adams* (1985), 109 Ill. 2d 102, 485 N.E.2d 339.

In this case, although Zernel presented no affirmative defense to the charges, his counsel's ploy was to discredit the victim and intimate that she willingly accompanied Zernel for an evening together, which she later regretted. Under these circumstances we believe that the prosecutor could fairly comment on the defendant's failure to call his mother, who had been present in the home and might have been able give some insight into the circumstances.

In addition, the State is allowed to comment when the defense invites such commentary. In this case defense counsel argued that Zernel would not have brought D.B. home to meet his mother if he intended to rape her and that it was improbable that the mother wouldn't have intervened if she heard crying and noises coming from Zernel's bedroom. Under these circumstances we believe that the State's comment "Where's the mom today?" was invited by the defense.

As to Zernel's claim that he was prejudiced by the prosecutor's repeated reference to D.B. as the "victim," we find no case law indicating that a prosecutor's use of the term "victim" when referring to a complaining witness is prejudicial error. We note, too, that the statutory definition of "victim," as that term is used in conjunction with criminal sexual assault and other related crimes, states that "victim" means "a person *alleging* to have been subjected to an offense prohibited by Sections 12—13, 12—14, 12—15 or 12—16 of this Code." (Ill. Rev. Stat. 1991, ch. 38, par. 12—12(g); 720 ILCS 5/12—12(g) (West 1992).) Furthermore, the use of the term "rape" by any victim, witness, State's Attorney, defense attorney, judge or other court personnel in prosecutions of this type is statutorily permitted. Ill. Rev. Stat. 1991, ch. 38, par. 115—11.1; 725 ILCS 5/115—11.1 (West 1992).

Finally, as we have often noted, the law clearly allows a prosecutor wide latitude in fashioning a closing argument and remarks, even if improper, will not constitute reversible error unless it can be said that they represent a material factor in the conviction. (*People v. Williams* (1991), 221 Ill. App. 3d 1061, 582 N.E.2d 1355.) In this case, objection is made to the prosecutor's reference to Zernel as a "violent menace" and to the defense theory as "desperate" and "ridiculous." We do not find these comments to be error.

Prosecution of a sexual assault case is not a duel between gentlemen; it is a contest where the reputations of both the accused and the accuser are placed into question. Use of the terms "ridicu-

lous" and "violent menace" in such cases is no more improper than the defense suggestion that the victim consented to the sex acts. Slinging a bit of verbal mud may not be polite, but it does not constitute reversible error in cases of this nature unless it is a material contribution to the guilty verdict.

As stated above, we find no error in the verdicts rendered by the jury and, accordingly, we affirm the judgment and sentence entered in this case.

Affirmed.

GORDON and COUSINS, JJ., concur.