THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES WILLIAMS, Defendant-Appellant.

First District (2nd Division)   No. 1—86—1521

Opinion filed June 30, 1989.

Randolph N. Stone, Public Defender, of Chicago (Millicent Willis and Z. Peter Tokatlian, Assistant Public Defenders, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Carol L. Gaines, and David L. Studenroth, Assistant State's Attorneys, of counsel), for the People.

JUSTICE EGAN* delivered the opinion of the court:

The defendant, James Williams, was found guilty by a jury of intentional murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)(1)), for the shooting death of Frank Rhodes and was sentenced to 35 years' imprisonment.

On October 31, 1984, at 9:30 p.m., Frank Rhodes was standing with five or six other persons, including his friends Duane Gratton, Wayne Mitchell and William Purchase, at 72nd and Eggleston in Chicago. They were attempting to start Purchase's car, which was parked facing east on 72nd Street next to Hamilton Park. The area was illuminated by a streetlight across the street.

While Rhodes and the others were working on the car, a man, later identified as the defendant, walked by on the sidewalk adjacent to the park heading east on 72nd Street. A person standing near Rhodes, identified only as "Ya Ya," said to the man, "What's happening, man?" After the man did not respond, Ya Ya asked, "Man, is you Folks or what?" "Folks" is the term used to describe street gangs affiliated with the Disciples; Rhodes and his friends, other than Purchase, were members of the Gangster Disciple street gang. The man turned around and said "I ain't no Folks. I ain't no sissy. All is well." The term "all is well" meant that he was a member of the "People." "People" is used to describe the rival group of gangs affiliated with the Stones: El Rukn, Black Stone or Cobra Stone street gangs. The man also wore his hat turned backwards and tilted toward the left, which also represented the Stones.

The man then pulled a gun from his jacket pocket and fired one shot, which hit Rhodes in the head, killing him. Those standing with Rhodes ran when the shot was fired; and the man fired two shots at them. He then walked up to Rhodes, who was lying on the ground,

---

*Justice Egan participated in the decision of this case prior to his assignment to the sixth division.

and it appeared to witnesses that he was going to shoot Rhodes again. At that moment two men came out of a courtyard building, and the man ran into Hamilton Park.

At approximately 9:45 p.m., Officers Terrance Pickens and Brian Daley of the Chicago police department received a radio call regarding the shooting. They arrived on the scene approximately 15 to 20 minutes later and interviewed Mitchell, Gratton and Purchase, who described the assailant as wearing a black cloth or leather jacket, black or navy blue pinstripe pants, white gym shoes and a dark-colored cap.

About one hour later, while the officers were interviewing the witnesses in their squad car, the defendant was seen walking through the park. Gratton first identified him as the assailant, and the others agreed. The officers arrested him; and the clothes he was wearing fit the general description given to the police, except that he was not wearing a hat and his jacket, although black, was not leather.

Later that evening, Detective David Golubiak requested that evidence technicians perform a gunshot-residue test on the defendant's hands. The test was performed between midnight and 1 a.m., approximately three hours after the shooting. The test did not disclose any residue on his hands. It was stipulated that the evidence technician would testify that during the course of taking the gunshot-residue test the defendant replied in response to the technician's question that he had washed his hands at about 10 p.m. that evening.

Jean Goliak, an employee of the Chicago Police Department Crime Laboratory with special training in gunshot-residue analysis, testified that hand-washing could destroy any gunshot-residue on the hands. Other factors which affect detection of residue include weather conditions, passage of time and whether the gun was fired indoors or outdoors. Golubiak, who was not an expert in the field of gunshot-residue, testified that he was told by technicians at a police crime laboratory class that the residue is very sensitive and could be destroyed when a person puts his hands in his pockets.

Golubiak also testified that the defendant was placed in a lineup at Area 3 Headquarters and viewed by six witnesses. Five of them were on the scene at the time of the shooting; the sixth was walking through the park when the assailant was fleeing the scene. Gratton identified the defendant as the assailant, as did Mitchell, who had known the defendant from the neighborhood for the previous 1½ years. Purchase identified the defendant by his clothes and voice; he had not seen the assailant's face. Neither Ray Peoples nor the witness walking through the park could make an identification. Another witness, Evon McCoy, could not identify the defendant and stated that he

had not seen the assailant.

Mitchell and Gratton testified at trial and identified the defendant. Purchase identified the defendant as the man he saw wearing the same clothes as the assailant. At the time of trial Gratton had criminal charges pending against him for unlawful use of a weapon, strong-arm robbery and two counts of aggravated assault. He denied that any promises had been made in regard to those cases in exchange for his testimony.

After his arrest the defendant gave an oral and two written statements. Although the record is not completely clear, it shows that he did tell the police and assistant State's Attorneys that he had shot Rhodes. These statements have been used in a puzzling fashion. The State successfully resisted the defendant's pretrial motion to suppress them but did not refer to them in the opening statement. (No issue is made here of the ruling denying the motion to suppress.) But the defendant's attorney did and told the jury that the defendant was coerced into making a signed statement "implicating himself in this crime." The State did not introduce the statements in its case in chief. It did, however, bring out, through the testimony of Officer Golubiak, that the defendant was given *Miranda* warnings, that he said he was willing to make a statement and admitted that he was a member of the Cobra Stone gang and affiliated with the Peoples gang. The defendant's attorney then brought out that the defendant had made oral statements.

Despite the fact that the State did not offer or introduce the statements, the defense brought out, through direct examination of Lisa Washington, the defendant's girlfriend with whom he had a child, that the defendant said "he did it" to the police officers but only after they said they were going to arrest her and take her baby from her.

The defendant testified that he told the officers and an assistant State's Attorney he knew nothing about the killing, but later led them to an area to look for a pistol. (No pistol was found.) We interpret his testimony to mean that he told them where to go and that he did so because of his fear for his life and that of his baby. Later he put in writing what the police officers wanted. He told them "how it was happening." His attorney asked, "When you signed this statement saying that you shot him, that wasn't true, was it?" The defendant answered that it was not true. On cross-examination he said that in his statement he said he "fired the gun." He said that because he was told to say it.

In rebuttal, the State called two assistant State's Attorneys and Officers Golubiak and Vallandingham, all of whom testified that the

defendant was not threatened or coerced in any way into making the statements. The State offered the two statements into evidence; they were admitted after the defendant's attorney said he had no objection.

During closing argument, the defendant's attorney told the jury, "You have the statements and I hope you read them very carefully." He argued that there were inconsistencies between what the defendant said in his statement and the testimony of the eyewitness. Later he said that the defendant wrote "out this confession."

The record reflects that the court sent back with the jury, the "various exhibits which [had] been admitted into evidence." We surmise that the statements were included. Neither the defendant nor the State has made those statements part of the record on appeal. Despite their absence, it is apparent that the jury heard evidence that the defendant had confessed to shooting Rhodes and that he had confessed voluntarily.

The defense was an alibi. The defendant testified that he had been a member of the Cobra Stone street gang for seven years and that at the time of the shooting he was at Lisa Washington's house. When he arrived there at about 6 p.m., her grandmother, brothers and sisters and two girlfriends were present. Lisa arrived home at about 7 p.m. The defendant left to go to the liquor store and returned to Lisa's home. He stayed there until 10 p.m., after the time of the shooting. He and Lisa had an argument and he went to the park to cool off. After he had been there for some time, he realized that he had left his keys at Lisa's home and returned to get them. However, she refused to return the keys, and the defendant left to go home. He walked through the park heading toward the flashing red lights and was arrested.

He denied telling the evidence technician who performed the gun residue test that he had washed his hands. He said that after the lineup he overheard officers telling the witnesses to identify him as the man who shot Rhodes. The only other witness for the defendant was Lisa Washington, who testified that she was questioned for about 13 hours by the police. During that time she and the defendant were brought together, and in his presence, one officer ordered her arrested and the baby taken from her. At that time the defendant said that he "did it." None of the other persons named by the defendant as having been present in Lisa Washington's home was called.

■ The defendant first contends that the evidence failed to establish his guilt beyond a reasonable doubt. A reviewing court will not set aside a jury's verdict unless an examination of the evidence demonstrates that it is so improbable, unsatisfactory or inconclusive as to raise a reasonable doubt of guilt. (*People v. Ellis* (1978), 74 Ill. 2d 489,

384 N.E.2d 331.) The defendant contends that there was a reasonable doubt created by the fact that when arrested he was not wearing a cap nor a black *leather* jacket, contrary to the description of the assailant given to the police; no weapon was recovered from him; and the residue tests performed on his hands were negative.

■■■ The sufficiency, weight and credibility of the eyewitness testimony is for the jury to determine. Positive identification by a single witness is sufficient to sustain a conviction, even though that testimony is contradicted by the defendant, provided the evidence establishes that the witness is credible and viewed the defendant under circumstances that would permit a positive identification to be made. (*People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631.) An identification is considered reliable where a witness had an adequate opportunity to view the assailant, showed an adequate degree of attention, described the assailant with a reasonable degree of accuracy, displayed a sufficient amount of certainty in identifying the accused and made the identification within a reasonable period of time following the event. *People v. Slim* (1989), 127 Ill. 2d 302, 537 N.E.2d 317; *People v. Wheatley* (1989), 183 Ill. 2d 590.

■■ Three eyewitnesses testified. Although Purchase did not see the assailant's face and could testify only that the clothes worn by the defendant at the time of his arrest were those of the assailant, the other two witnesses made clear and unequivocal identifications of the defendant himself. A doubtful, vague or uncertain identification will not support a conviction (*Slim*, 127 Ill. 2d at 307), but the two witnesses here made positive identifications shortly after the shooting and did not waver. Mitchell and Gratton had adequate time to view the defendant and under such circumstances that would permit an adequate identification. Mitchell, in fact, had seen the defendant in the area on prior occasions over a period of 1½ years. Minor discrepancies in their description of the clothing are not sufficient to impeach the jury's verdict. *Slim*, 127 Ill. 2d at 309; *People v. Jefferson* (1989), 183 Ill. App. 3d 497.

That the defendant was arrested without the gun in his possession is not surprising since there was a sufficient passage of time between the shooting and the arrest to allow him to dispose of the weapon. There are also plausible explanations for the negative gun-residue test: the defendant washed his hands or too much time had passed for the test to be probative. The jury is not required to search out a series of potential explanations compatible with innocence and elevate them to the status of reasonable doubt. *People v. Benedik* (1974), 56 Ill. 2d 306, 307 N.E.2d 382.

■ In his argument on the sufficiency of the evidence, the defendant makes no mention of his statements admitting that he had shot Rhodes. We judge that the identification by the witnesses and the written admissions by the defendant that he shot the victim were more than sufficient to establish his guilt beyond a reasonable doubt.

■ The defendant next contends that the State's closing argument denied him a fair trial in that the prosecutor improperly commented on the defendant's failure to call alibi witnesses. He preserved this error by a motion *in limine*, which was denied. The cases, except one, cited by the defendant in his opening and supplemental briefs preceded *People v. Kubat* (1983), 94 Ill. 2d 437, 447 N.E.2d 247, in which the supreme court resolved conflicting authority in this State on the question of whether it is improper for the prosecutor to comment on the defendant's failure to support his alibi by presenting the alleged alibi witnesses. In *Kubat*, the supreme court held "that where a defendant injects into the case the name of an alibi witness and then fails to call the witness, the prosecutor may legitimately comment on the lack of such evidence although it may not be relief upon as proof of the charge." (94 Ill. 2d at 498.) We believe that the remarks of the prosecutor here meet the standards of *Kubat*.

In his reply brief the defendant has cited *People v. Moya* (1988), 175 Ill. App. 3d 22, 529 N.E.2d 657. There the prosecutor said that the defendant's mother, a purported alibi witness, "wouldn't get on the stand and lie for him." The appellate court held, without mentioning *Kubat*, that the remark was improper because the prosecutor made the comment "well aware of the fact that defendant had been precluded from introducing information as to his mother's whereabouts and that defendant had no means of rebutting this comment within the evidence previously adduced at trial." (175 Ill. App. 3d at 24.) We do not believe that case is pertinent here.

■ The defendant refers to a number of other arguments to which no objection was made but which the defendant contends constituted plain error. In the first of those arguments, the prosecutor was discussing the burden of proof:

"The standard of proof in this case is beyond a reasonable doubt, and the State has met it. Each of the propositions we are required to prove beyond a reasonable doubt. Beyond a reasonable doubt. The same burden of proof that is used every day in every courtroom in every city and state and federal court in this country. Certainly not an impossible burden, but one that we had accepted and embraced and one that we had met."

We agree with the State's argument that these comments fall within

the argument permitted in *People v. Bryant* (1983), 94 Ill. 2d 514, 523, 447 N.E.2d 301, where the court found no error in the prosecutor's comments that the State's burden was "not unreasonable" and "met each and every day in courts." We do not agree with the defendant's argument that the comments were like those condemned in *People v. Starks* (1983), 116 Ill. App. 3d 384, 395, 451 N.E.2d 1298, wherein the prosecutor asserted that the burden was the same as in "any type of case" and that "we don't have a burden."

■■ In the second argument, the defendant contends, the prosecution attempted "to place the weight of his office behind the charges" by referring to the testimony of two assistant State's Attorneys who explained the process for approval of felony charges; and in the third, the prosecutor implied that the defense attorney was trying to deceive the jury. We do not so construe the prosecutor's rebuttal arguments; and both were proper responses which were invited by the defendant's argument. *People v. Wilson* (1980), 87 Ill. App. 3d 693, 409 N.E.2d 344.

There are two other arguments of the prosecution which were, however, improper. As previously noted, one of the witnesses, Duane Gratton, had charges pending against him at the time of trial and testified that no agreements had been made with him. During the argument the defendant's attorney said this:

> "They bring in Gratton. We know he is on trial now for pistol toting and God knows what else. That is a reason to say anything that you feel will help you. Make no mistake about it, it's no accident that his case hasn't been resolved yet. It was pending until he cooperated in this case. I don't know what the deal is with him. But we know that he still has a case pending and that is a motive to lie. That is a reason to overly cooperate, and that's what happened in this case."

To that argument, the prosecutor said this:

> "Well, ladies and gentlemen, Mr. Gratton testified there was no deal, and *I'll tell you there was no deal. The first time I talked to Duane Gratton was Friday of last week. The first time I found out he had a case pending anywhere in this system was Friday of last week. I'm the person who talked to Duane Gratton.* *** There is no deal with Mr. Gratton. His statements to police occurred before his pending case occurred. They gave statements to the police. The police officers wrote reports." (Emphasis added.)

The remarks of the prosecutor which amounted to his testimony that there was no deal and thus a corroboration of Gratton were improper.

See *People v. Ford* (1980), 83 Ill. App. 3d 57, 403 N.E.2d 512.

██ In another part of the argument the prosecutor said this:

> "It is true that the defendant does not have to prove anything. But when the defendant offers his own testimony or attempts to prove something, his evidence and his testimony is [*sic*] to be judged by the same standards of reasonableness and credibility as the State's evidence. *When he attempts to prove something, it has to be corroborated.* All you have is the statement, 'I was there 'til ten after 10:00.' Yet Lisa Washington and all these other people aren't here. They never said he was there until ten after 10:00." (Emphasis added.)

The statement that when the defendant attempts to prove something, it has to be corroborated, was a misstatement of the law. But we do not judge that these two improper arguments, to which no objection was made, amount to plain error because they did not, in view of the evidence, substantially prejudice the defendant nor affect the verdict. *People v. Hine* (1980), 88 Ill. App. 3d 671, 410 N.E.2d 1017.

The defendant's last contention is that this court should remand the case for a new sentencing hearing because, he claims, the court accepted a misstatement of the evidence made by the assistant State's Attorney when considering the defendant's sentence, or, alternatively, that we should reduce the sentence because the trial court allegedly failed to consider that the defendant is a good prospect for early rehabilitation and had no juvenile record or felony convictions.

██ The prosecutor mistakenly told the judge that Rhodes had no "involvement in a gang." The judge, in his summation, said that the defendant's action "led to the death of an innocent individual." We do not construe the judge's remarks to be an acceptance of a misstatement of fact. Indeed, he also said that there was a "strong indication regarding gang relationships." These are accurate observations of the record. The deceased was an "innocent" person in the eyes of the law when he was killed without any provocation, even if he had been a member of a gang. The rest of the remarks of the judge disclosed that he considered all of the appropriate factors before sentencing the defendant. Therefore, we will not substitute our judgment for his.

For these reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

BILANDIC, P.J., and HARTMAN, J., concur.