THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DANIEL MAKIEL, Defendant-Appellant.

First District (2nd Division)   No. 1—91—1179

Opinion filed May 24, 1994.

McCORMICK, J., concurring in part and dissenting in part.

Michael J. Pelletier and Maria A. Harrigan, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Maureen A. Harton, and Linda J. Jakubs, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE DiVITO delivered the opinion of the court:

The principal questions we address in this case are (1) whether law enforcement officials may properly initiate interrogation, after *Miranda* admonitions, of an already indicted defendant who had accepted counsel for purposes of a concluded extradition proceeding; and (2) whether the trial court conducted a proper inquiry into the competency of a witness and the relevancy of the evidence he would offer before deciding to exclude his testimony. We answer the first question "yes" and the second one "no."

Defendant Daniel Makiel was indicted on April 7, 1989, for the murder and armed robbery of Katherine Hoch, which occurred on October 19, 1988, at the Mobil gasoline station she managed in Calumet City, Illinois. On October 20, 1989, police executed a warrant for defendant's arrest at the Indiana Department of Corrections. Indiana extradited defendant, and Illinois authorities transported him to Cook County. A jury later found defendant guilty of first degree murder and armed robbery, and he was sentenced to a term of natural life in prison for the murder, consecutive to an extended term of 60 years' imprisonment for the armed robbery, both sentences to be consecutive to a 40-year sentence for attempted murder in Indiana.

Prior to trial, defendant moved to suppress his pretrial statement to the police. Defendant argued that his October 20, 1989, statement was taken in violation of his sixth amendment right to counsel, because an assistant State's Attorney began questioning him on the drive from Indiana to Illinois after his extradition hearing where he had been represented by appointed counsel. The circuit court denied defendant's motion.

At trial, Todd Hlinko testified that in October 1988, he lived with defendant at defendant's father's house in Calumet City. On October 19, 1988, he and defendant had possession of a blue Oldsmobile Cutlass 442 owned by their friend, John Miller, who had loaned the car to defendant for transmission repair work. The Cutlass was a distinctive shade of blue, with wide, white striping emblazoned with "442" across the side panels. In later testimony, John Miller stated that he had loaned the car to Hlinko and defendant on October 19, 1988, and noticed from its condition the next day that the car had been driven overnight.

Hlinko testified that he and defendant used the Cutlass to pick up Sammy Ilich from work at about 5 p.m. on October 19, 1988. Defendant drove, Hlinko sat in the passenger seat, and Ilich sat in the back. They drove around Dolton and Calumet City, looking unsuccessfully for parties or somewhere to sell marijuana. They stopped at defendant's house to use the telephone at 7 p.m. At about 7:30 p.m., they drove to the Harrison Park area of Hammond, Indiana, where defendant got out of the car and went up to "some guy's house." When defendant returned to the car, he gave Ilich a "hit" of acid and took some himself. Although Hlinko said that he did not take acid that night, he had used it before.

They drove toward Calumet City, stopping to play pool and still trying to sell marijuana. At approximately 11 p.m., defendant said he "would stop and get some money." They pulled into the Mobil gasoline station at Burnham and Michigan City Roads in Calumet City, parking the Cutlass just off Michigan City Road. They waited in the car for a few minutes, listening to music, until two customers who were in the station left. Then they pulled the car next to a white van, which was parked parallel to the east side of the station. In later testimony, Hoch's husband identified the white van as the vehicle Hoch drove to work that day.

Hlinko followed defendant out of the Cutlass and into the station. As they entered, Hlinko saw Hoch walking from the counter in the mini-mart, towards the back room. Defendant told him to "watch out," pointed a gun at Hoch, grabbed her arm, and led her into the back room. As he acted as lookout, Hlinko heard defendant demand money from Hoch, heard noises like drawers slamming, and heard a single gunshot. Defendant then exited the back room, holding the gun and a purse, and went behind the counter to the cash register. Defendant picked up an envelope from the cash register and took two packs of cigarettes and handed them to Hlinko. Hlinko saw no one else in the station at the time and estimated that only a few minutes elapsed while they were inside.

When they returned to the car, defendant put the purse under the driver's seat. Although he guessed what had happened in the station, Hlinko kept asking defendant "what the hell was going on." Defendant responded, "Don't worry about it." As he drove, defendant told Hlinko that "something went wrong" at the station. Ilich asked to go to his home in East Chicago, but as they neared his house Ilich changed his mind and they headed instead to the house of Shane Miller (no relation to John Miller), also in East Chicago. En route, they stopped in an alley near Ilich's house, and defendant left the car with the purse and walked to a dumpster. Hlinko did not see what

defendant did there, but noticed that defendant returned to the car without the purse.

At about 11:30 p.m., Shane invited Hlinko, Ilich, and defendant into his house, and the four of them smoked a marijuana cigarette. About five minutes later, all four drove in the Cutlass to the Calumet Expressway, with Shane and Ilich in the back seat. Defendant, who was driving, slowed the car down and took the gun from his pants as they crossed the bridge near Calumet City. He handed the gun to Hlinko, and told him to get rid of it. Hlinko threw the gun out the passenger window and into the Cal-Sag River. Shane asked what Hlinko threw out the window, and Hlinko answered that it was a gun.

They then returned to the same Calumet City Mobil station, arguing about who would get out and pump the gasoline. They saw squad cars in the parking lot, and a police officer stopped their car at the entrance, telling them that something had happened and that they would have to leave.

They drove from the station to defendant's house, arriving around midnight. Hlinko and defendant went upstairs to defendant's bedroom, while Ilich and Shane used the downstairs bathroom.

During the moments before Ilich and Shane entered the bedroom, Hlinko again asked defendant what happened, and defendant again told him not to worry, and that something went wrong. After Ilich and Shane entered the room, Hlinko heard defendant tell Shane about the killing. The four then drank alcohol and smoked marijuana.

At about 1 a.m., John Pullyblank and his girl friend arrived at defendant's house, but no one said anything to them about the killing. When the two newcomers offered to go out and buy more alcohol, defendant contributed $20 for himself, Ilich, and Hlinko. Hlinko testified that the $20 surprised him because defendant usually had no money and Hlinko had paid for everything earlier that evening. In later testimony, Pullyblank said that he was friends with Ilich, Hlinko, and defendant, but denied seeing Shane while visiting defendant's house; he also did not know for certain whether he visited defendant's house on the night in question.

Hlinko further testified that, after the night of October 19, 1988, defendant next spoke to him about the killing upon returning from the police station, where the police had questioned him about an unrelated purse snatching. Defendant told him not to worry about the killing because they "got away with it" and because the police showed more interest in the purse snatching than in the killing.

On March 2, 1989, the police arrested Hlinko on a drug offense which also violated his probation. While in custody on March 2, 1989,

Hlinko signed a statement in which he stated that on October 19, 1988, defendant went into the Mobil station alone, and that he, defendant, and Ilich drove to defendant's house directly from the station. In the statement, he said he saw a purse at defendant's house when he and defendant went to sleep on October 19, 1988.

The police arrested Hlinko again on March 16, 1989, this time for the armed robbery and murder at the Mobil station. Hlinko testified that he initially confirmed the truthfulness of his March 2 statement. He told the police on March 16 about defendant's statements to him after defendant's interrogation regarding the purse snatching. He might have told the police that defendant and others left the house at around 11 p.m. on October 19, 1988, to buy cigarettes at the Mobil station. Hlinko eventually signed a statement for the police on March 16, 1989, which differed from the March 2 statement. In the March 16 statement, he again placed himself, Ilich, and defendant at the station, but said that he stayed in the car while defendant and Ilich went inside. He told the police on March 16 that he saw defendant throw things out of the car window on October 19, 1988, but did not see a gun.

Hlinko testified that he lied to the police at first about not going into the gas station in an attempt to avoid implicating himself. He felt great pressure on March 16 and signed the statement because the police told his parents he should cooperate or be charged with the murder. He later filed charges of police brutality, alleging that the police beat him in order to obtain his statement. In April 1989, he told his mother, his attorney, and defendant that the police beat him. He said, however, that he had lied about the police brutality in order to discredit his prior statements and to protect his friends.

Beginning in March 1989, Hlinko, Ilich, and defendant were in jail together on the murder charges. Hlinko testified that during that time, defendant persuaded him to sign an affidavit which defendant dictated and which disclaimed all of his previous statements. The affidavit claimed falsely that he had never seen defendant with a firearm and that defendant had no involvement in an armed robbery or a murder. The affidavit contained nothing about their having gone to Shane Miller's house on October 19, 1988, but instead stated that defendant had babysat at his sister's house that night. Hlinko did not read the affidavit before signing it; defendant took it away as soon as he signed it and later gave him a copy. Describing the babysitting alibi as impossible and untrue, Hlinko testified that his lawyer told him he should not have signed the affidavit.

Hlinko further testified that in October 1990, he entered a plea agreement with the State's Attorney's office. The State's Attorney

dropped the armed robbery and murder charges and agreed to recommend a five-year sentence for the March 2, 1989, drug offense, to run concurrently with the sentence for his violation of probation. In exchange, Hlinko agreed to testify truthfully about the events of October 19, 1988. Hlinko rejected an earlier plea offer out of loyalty to defendant. He entered into the October 1990 agreement because he did not want to go to prison for a shooting that defendant committed. He enjoyed no special treatment or better living conditions in prison because of the agreement. Hlinko denied telling Ilich's mother on October 29, 1990, that he intended to lie to the State's Attorney in order to save his own life. Finally, Hlinko testified that the assistant State's Attorneys never told him what to say and that he signed a statement confirming the truth of his anticipated trial testimony.

Shane Miller testified that he had seen defendant hand something to Hlinko while in the Cutlass on the Calumet Expressway, telling him to get rid of it. He saw Hlinko throw it out of the window into the Cal-Sag River, and when he asked Hlinko what it was, Hlinko told him it was a gun.

Shane stated that the four men stayed at defendant's house for about 25 minutes, during which time defendant told Shane that he, Ilich, and Hlinko had gone to the gas station and that he had shot the woman manager. Brian Spodach dropped by and gave Shane a ride to Shane's sister's house. Shane said nothing to either his sister or Spodach about the conversation with defendant. Spodach later testified that he neither went to defendant's house nor gave Shane a ride on October 19, 1988. He heard about the Mobil station murder two weeks after it occurred, and at that time deliberately told himself he was not with Shane on the date in question. Spodach admitted that he did not want to testify, but denied telling anyone that if called he would say that he knew nothing about the suspects.

Shane also testified that he did not want to testify and told this to defendant's lawyers and to Hlinko's mother. He read about the killing in the newspapers but did not go to the police with information until March 1989, when he testified before a grand jury. On March 15, 1989, he signed a statement for the police detailing the October 19, 1988, conversation in defendant's bedroom. The police did not threaten him. He had spoken with Hlinko's mother 15 to 20 times after Hlinko was charged with the murder in March 1989. On February 20, 1990, Hlinko's mother came to his house and persuaded him to sign a statement she had written. Shane denied writing in the February statement that the police forced him to make his statement the previous March by threatening to charge him with withholding

evidence and involvement in the murder. Hlinko's mother wrote the February 1990 statement in order "to get her son out of jail." He denied ever reading the statement in its entirety. Knowing it was untrue, Shane signed it anyway, because Hlinko's mother cried and begged him to do so.

Ilich, who had been acquitted of the murder and armed robbery charges in a previous jury trial, did not testify.

Assistant State's Attorney Patrick Quinn testified that on March 21, 1989, in the presence of police investigators and after reading defendant his *Miranda* rights, he interviewed defendant, who was in custody in Indiana after being convicted of attempted murder. Defendant told Quinn that his sister, Laura Kobak, had visited him earlier that day and warned him to expect a visit from State investigators. Defendant denied knowing anything about the murder or what he did on October 19, 1988. When Quinn prompted defendant with information already given by Hlinko and John Miller concerning that day, defendant said that he remembered. Defendant told Quinn that he and Hlinko dropped John Miller off at his workplace, drove around in John's car, and kept the car with the intention of fixing it. He told Quinn that they quite possibly went to the Mobil station to buy cigarettes. Defendant later told Quinn that when they stopped at the station, Ilich was not with them.

Quinn informed defendant that a witness had seen Ilich with him and Hlinko at the Mobil station at or about the time of the murder. At this point defendant sat up straight, opened his eyes wide, and said he suddenly remembered that Ilich had joined them that night when they stopped at the Mobil station. He told Quinn that he remembered no details of the gas station stop because he drank alcohol all day, smoked marijuana with Hlinko, and dropped acid. Defendant called Ilich and Hlinko his partners and said that Ilich and Hlinko could not have gone into the station and murdered Hoch without his knowledge.

Quinn testified that he next interviewed defendant on October 20, 1989, after defendant was extradited, while transporting him to Illinois. Quinn read defendant his rights, and defendant again indicated that he understood his rights and agreed to talk. Defendant told Quinn that since the previous interview, defendant's sister had informed him that her birthday fell on October 19. After speaking with his sister, defendant remembered that on her birthday in 1988, he and Hlinko attended the sister's birthday party in Indiana. He said that John Pullyblank and Ilich did not attend the party. Defendant told Quinn that they arrived at his sister's birthday party in the early evening and returned to Chicago at around 11 p.m. Defendant

said that he burned up the transmission in John Miller's car and had it towed.

Allen Martin testified that at about 11 p.m. on October 19, 1988, he and his girl friend stopped at the Mobil station to buy gasoline. He recognized John Miller's distinctively painted Cutlass 442 parked along the fence on the east side of the station. He saw his friends—defendant, Hlinko, and Ilich—sitting in the Cutlass. After he paid for his gasoline, he waved to the three men still sitting in the Cutlass, got into his car, and drove to a gameroom. He estimated that he stayed at the Mobil station a total of three minutes and at the gameroom for 20 minutes before he left to drive his girl friend home.

On the way to his girl friend's house, Martin passed the Mobil station and saw an ambulance and squad cars. He read about the Mobil station murder in the newspaper and later read about defendant's, Hlinko's, and Ilich's implication in the crime. It took him a while to make a connection between his having seen his friends at the station on October 19 and their possible involvement in the murder.

Martin further testified that he remembered talking to a public defender on January 21, 1991, but denied telling the public defender that he saw Hlinko and defendant smoking marijuana at the gas station on October 19, 1988, or that he had been in a fight with Hlinko.

George Mainwaring, a Chicago streets and sanitation department employee, testified that he worked on the southeast side of the city on October 24, 1988. On that day, he found a purse while emptying a trash can in the alley behind 9315 Chappel Street. He kept the purse and examined it when he returned home that afternoon. He touched numerous items in the purse. Hoch's husband testified that the purse recovered by Mainwaring and its contents belonged to Hoch. Mainwaring delivered the purse to the police after recognizing Hoch's name, as well as her picture, on her driver's license. He accompanied police officers to the location where he found the purse. The address where the purse was found is less than 10 minutes from where Ilich lived and five minutes from where Shane Miller lived. The police took Mainwaring's fingerprints and those of his partner.

Mary Leanne Grey, a forensic scientist and fingerprint expert with the Chicago police, testified that she found neither Mainwaring's nor his partner's prints on the purse or its contents. She found 16 latent fingerprints and identified eight of them as belonging to Hoch, but she could not identify the other eight. She explained that the inability to find an individual's fingerprints on an item does not necessarily mean that the individual did not touch the item, but only that the individual left no suitable prints.

Dan Engelbrecht testified that he pulled into the Mobil station after 11 p.m. on October 19, 1988. He went inside looking for the attendant and found no one in the mini-mart area. He opened the door to the back room and found Hoch lying on the floor, her head in a large pool of blood. He told another customer to call 911 and dragged Hoch's body into the mini-mart, where he had more room to perform CPR. He remained at the station for an hour, but did not notice Hoch's white van parked beside the building.

Stephen Lundy, the first police officer on the scene, testified that the crime was reported on the 911 emergency system at 11 p.m. Someone had obviously moved the body from the back room before he arrived. Soon after his arrival, other police officers blocked the driveway to the station in order to prevent anyone from entering. Although he found a .38-caliber shell casing in the back room, no suitable fingerprints were found on the casing. Similarly, the evidence technician who searched the station for prints could find no suitable lifts inside or outside the station. The leader of the Illinois State Police northern diving unit testified that his unit searched the Cal-Sag River for the murder weapon, but did not find it.

Following stipulations, and the admission of exhibits into evidence, the prosecution rested.

Ilich's mother testified for the defense that on October 19, 1988, her family lived in Chicago. Her son's friend, Todd Hlinko, called her from jail on September 29, 1990. Hlinko told her he did not know whether defendant killed Hoch, because he did not actually see it.

Tony Rodriguez testified that he and Manny Raices visited defendant's sister's house in Hammond after 8 p.m. on October 19, 1988. John Pullyblank drove with them but was passed out in the car for the couple of hours that they stayed in the house. Defendant, Hlinko, Hlinko's girlfriend Lisa Majszak, and Majszak's cousin Cory Majszak were babysitting the sister's children. The sister had left her station wagon so that defendant could give the Majszaks a ride home. Rodriguez saw John Miller's Cutlass 442 up on jacks in defendant's driveway earlier that day.

Rodriguez testified that he did not know that defendant's sister went out that night to celebrate her birthday and did not know whether the night they babysat was, in fact, her birthday. The night they babysat could have been her birthday or could have been after her birthday. He acknowledged that a police investigator told him the actual date in question, but he was certain it was his payday, a Wednesday. He could not remember what he did on the subsequent payday, October 26. He spoke to defendant's sister after Hlinko's and defendant's arrest, and at that time remembered visiting defendant's

sister's house. Although he thought it "funny" that the police would charge his friend with the murder, Rodriguez decided not to tell the police about the possible alibi for defendant.

Laura Kobak, defendant's sister, testified that defendant agreed to babysit on October 19, 1988, when she and her boyfriend Bill Nagy decided to go out on the spur of the moment to celebrate her birthday. Defendant, Hlinko, and Lisa and Cory Majszak arrived at about 6:30 p.m. Hlinko and defendant were alone with the children when Kobak and Nagy returned around midnight. She mentioned the babysitting incident to no one prior to defendant's and Hlinko's arrest for murder in March 1989. Kobak spoke to Lisa Majszak about the night that Lisa and her cousin babysat, in order to assure herself that defendant had an alibi for October 19, 1988. She talked briefly with Nagy about the coincidence of dates, but did not go to the police because someone told her it would do no good.

She testified that she saw Assistant State's Attorney Quinn's name in newspaper coverage of the investigation and called someone who identified himself as Patrick Quinn. Because the person identifying himself as Quinn did not want to hear what she had to say, she did not tell him anything about the alibi. She did not request a meeting with Quinn because someone told her it was not worth the effort. Kobak talked to defendant in March 1989 about the babysitting alibi. Defendant remembered babysitting with Hlinko, Lisa, and Cory when she brought up the subject.

Howard Lindenbarker testified that he stopped at the Mobil station at 11:04 p.m. on October 19, 1988, and that the register tape recorded his purchase. He purchased his cigarettes with two $1 bills, and passed another male entering the station on his way out. He saw neither a blue Cutlass 442 with white stripes nor a white van, although he admitted that a white van could have been parked there. Michael Furtek testified that he paid for gasoline at the Mobil station with a $10 bill, and could not remember seeing Lindenbarker or any other customer or vehicle while pumping his gas.

Kevin Kolcynski testified that he purchased cigarettes and a beverage at the gas mini-mart after 11 p.m. on October 19, 1988, parking his van directly in front of the station door while making his purchases. He did not notice a blue Cutlass 442 or a white van parked next to the building. The clock at his nearby house read 11:13 p.m. on his return, but he admitted that all the clocks in his house probably read different times. The police read to him the record of his purchases off the register tape, but did not read the time of purchase. He admitted he could have made his purchase at 10:59 p.m.

John Albert testified that he passed the Mobil station between

11:10 and 11:20 p.m. on October 19, 1988, looked toward the station, and saw neither a blue Cutlass 442 nor a white van. Trina Dorsey testified that she stopped at the red light outside the Mobil station after 11:01 p.m. on October 19, 1988. As her car moved from the stoplight, she noticed a light-blue Pontiac and a maroon car parked on the west side of the station. A white male stood pumping gas by the light blue car and one person sat inside it. She told the police that she did not see the man very clearly and would not be able to identify him. She did not look inside the station. She did not see a crime being committed, a blue Cutlass 442, or a white van.

The court precluded the defense from presenting the testimony of Tim Anderson, an 11-year-old psychiatric patient suffering from post-traumatic depression and stress due to sexual assault. Anderson had made a statement to the police regarding the armed robbery and murder. Anderson's statement, read at a sidebar outside the presence of the jury, said that in August 1988 he had sneaked out of his parents' home at around midnight. He went to an apartment, where he encountered three white males named Brandon, Brian, and Jay. Jay said, "Let's go get some money," whereupon they drove in Brandon's four-door sedan to the Mobil station. At the Mobil station, Jay took out a large, dark automatic handgun, cocked it, and went inside. Although the car windows were rolled up all the way and the stereo was loud, Anderson heard a single shot from inside the station that was so loud that he covered his ears. Jay returned, drove back to the apartment, and admitted killing a woman. Brian threatened to kill Anderson if he told anyone. Anderson remembered nothing else about that night, but he remembered that all the kids at school the next day were talking about the murder.

The prosecutors pointed out to the court that Anderson never claimed to have seen anything. They cited case law which permitted the court to exclude testimony concerning the possibility that someone else committed the crime, when the court considers the testimony too remote or speculative. Follow-up investigation into Anderson's statement revealed that, as far as the investigators could tell, Jay did not exist. The Brandon and Brian about whom Anderson had spoken told police that the incident never happened and that they had not even met Anderson until the summer of 1989. The defense countered that Anderson would testify as to October, not August, and that he would testify that Jay exited the station with two packages of cigarettes. The defense acknowledged that Anderson's original statement to the police said nothing about October or about cigarettes.

The prosecutors argued that Anderson's testimony introduced

collateral issues of competency as to age and mental capacity, issues which would require appointment of counsel for the minor. Case law favors admission of testimony implicating a different accused only if evidence links the third party closely to the crime. Admission of Anderson's testimony would therefore require the State to prove, based on his statement and mental history, that Brian, Brandon, and Jay did not commit the crime. The defense responded that the prosecutors did not establish the irrelevance of Anderson's statement, which the defense described as plausible.

The court granted the State's motion *in limine* to exclude Anderson's testimony, on the grounds of competency, remoteness, and questionable references to time and date. Although the prosecutors had Anderson's original police statement for impeachment, the court ruled that the anticipated testimony by psychiatric experts regarding his competence would be collateral, and it based its ruling in part on the collateral issue. The court claimed it made no holding as to Anderson's competence, but competency represented just one of the other collateral matters that the court would have to address if it further considered allowing Anderson to testify. The court accepted Anderson's statement as an offer of proof, and the defense rested.

Cook County Sheriff's Police Investigator Donald Morrison testified as a prosecution rebuttal witness that he spoke with Rodriguez about visiting Kobak's house in October 1988, and that Rodriguez did not know the exact date of the visit. Rodriguez knew he went to Hammond on a Wednesday, because he was paid on Wednesdays. Rodriguez said nothing about Pullyblank's passing out in the car.

Cory and Lisa Majszak testified that they, defendant, and Hlinko babysat at Kobak's house only once, after October 23, 1988. Cory had a very close friendship with her cousin Lisa. Consequently, Cory remembered with certainty that Lisa and Hlinko went on their first date on October 23, 1988; the occasion was something that she kept track of. Cory remembered that on the night they babysat, Hlinko and Lisa had already started dating. Therefore, she testified, they babysat sometime after October 23, 1988. Lisa, too, remembered first going out with Hlinko on October 23, 1988, and that the date had special significance for her. She also remembered that she and Hlinko had already begun dating on the evening they babysat at Kobak's. Lisa and Cory did not see Pullyblank, Raices, or Rodriguez on the evening that they babysat with defendant and Hlinko.

Lisa testified that she initially could not recall the exact date on which they babysat when she spoke to Investigator Morrison, but was certain that it was after October 23; she did not go to Kobak's

house on October 19, 1988, because she and Hlinko were not yet together on the 19th. Kobak called her a week before the trial, at which time she denied that she had offered information to Morrison.

During closing argument, the court sustained defense counsel's objection to the prosecutor's statement about Raices's failure to testify. The prosecutor pointed out that the nine defense witnesses failed to corroborate each other, and defense counsel failed to question Pullyblank about the alibi. The court overruled defense counsel's objection to the comment that their defense witnesses from the gas station did not see the white van or even each other. The court also overruled the defense objection to the comment that defense counsel did not show the register tape time to Kevin Kolcynski because his confused time frame would have deflated the defense theory.

The jury found defendant guilty of murder and armed robbery. It also found defendant eligible for the death penalty, but found sufficient mitigating factors to preclude its imposition. The circuit court thereafter sentenced defendant as previously indicated.

## · I

Defendant's first contention is that the circuit court erred in denying his motion to suppress the statement he made to Quinn on the ride back to Illinois following his extradition from Indiana, because Quinn elicited the statement in violation of defendant's sixth amendment right to counsel. The sixth amendment right to counsel "attaches with the initiation of adversary, judicial criminal proceedings *** by way of formal charge, preliminary hearing, indictment, information, or arraignment." (*People v. Kidd* (1989), 129 Ill. 2d 432, 448, 544 N.E.2d 704.) The State concedes that defendant's sixth amendment right to counsel attached when the grand jury indicted him on April 7, 1989, six months before he made the statement he now challenges.

■ Attachment of the sixth amendment right to counsel, however, is not enough. It must also be invoked. "[T]he fact that a right to counsel exists does not necessarily mean that it has been invoked." (*People v. Jackson* (1990), 198 Ill. App. 3d 831, 844, 556 N.E.2d 619, *appeal denied* (1990), 133 Ill. 2d 565, 561 N.E.2d 700, *cert. denied* (1991), 501 U.S. 1233, 115 L. Ed. 2d 1025, 111 S. Ct. 2858.) It is the invocation of the right to counsel, not its mere attachment, that renders a subsequent waiver of the right during interrogation ineffective for the remainder of the proceedings. *McNeil v. Wisconsin* (1991), 501 U.S. 171, 115 L. Ed. 2d 158, 111 S. Ct. 2204.

The State contends here that defendant validly waived his sixth

amendment right to counsel by answering questions following *Miranda* warnings during the ride to Illinois. The United States Supreme Court in *Patterson v. Illinois* (1988), 487 U.S. 285, 291, 101 L. Ed. 2d 261, 271, 108 S. Ct. 2389, 2394, established that a defendant may waive the sixth amendment right to counsel by agreeing to answer questions following *Miranda* warnings, provided that the defendant had not previously invoked the attached right.

*Patterson* is part of the line of cases applying *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, in which the Court intended "to give concrete constitutional guidelines for law enforcement agencies and courts to follow." (*Miranda*, 384 U.S. at 441-42, 16 L. Ed. 2d at 705, 86 S. Ct. at 1611.) The United States Supreme Court and Illinois courts have subsequently emphasized the need for clear rules which law enforcement officials and courts can easily apply. (See *Arizona v. Roberson* (1988), 486 U.S. 675, 100 L. Ed. 2d 704, 108 S. Ct. 2093; *People v. Olivera* (1993), 246 Ill. App. 3d 921, 617 N.E.2d 98.) In *Michigan v. Jackson* (1986), 475 U.S. 625, 89 L. Ed. 2d 631, 106 S. Ct. 1404, the Court stated, as a bright line rule, that when a defendant invokes his right to counsel after his sixth amendment right to counsel has attached, police are not permitted to initiate any further questioning of the defendant, and any subsequent waiver the defendant makes in interrogation initiated by police is invalid.

Since in this case Quinn admitted that he initiated the questioning in the car following extradition, defendant's waiver of his sixth amendment right to counsel following *Miranda* warnings is valid only if defendant had not previously invoked that right.

Defendant argues that he invoked his right to counsel for all proceedings in this case when he accepted representation of counsel at the extradition proceedings on the charges at issue. The State argues that this acceptance of counsel does not constitute invocation of the right to counsel because the acceptance of counsel in an extradition proceeding does not constitute invocation of counsel in the underlying case.

It is well settled that an extradition hearing is not a part of the underlying criminal prosecution. As the United States Supreme Court stated, "the fact that a proceeding will result in loss of liberty does not *ipso facto* mean that the proceeding is a 'criminal prosecution' for purposes of the Sixth Amendment. Nor does the fact that confinement will be imposed in the first instance as a result of that proceeding make it a 'criminal prosecution.'" *Middendorf v. Henry* (1976), 425 U.S. 25, 37, 47 L. Ed. 2d 556, 566, 96 S. Ct. 1281, 1289.

The state of the law in Illinois is best summarized by our supreme

court's decision in *People v. Young* (1992), 153 Ill. 2d 383, 607 N.E.2d 123, *cert. denied* (1993), 510 U.S. 829, 126 L. Ed. 2d 64, 114 S. Ct. 97:

"In Illinois, the Uniform Criminal Extradition Act (Ill. Rev. Stat. 1989, ch. 60, par. 18 *et seq.*) governs the extradition of fugitives. Extradition is a summary and ministerial procedure for the purpose of returning a fugitive to the demanding State so that he may stand trial. (*Papas v. Brown* (1980), 88 Ill. App. 3d 471[, 410 N.E.2d 568].) Because the purpose is only to return the fugitive to the demanding State, the only constitutional right involved is that of personal liberty. (*People ex rel. Shockley v. Hardiman* (1987), 152 Ill. App. 3d 38[, 504 N.E.2d 109].) Furthermore, extradition is not a judicial inquiry into the merits of a charge. (*People v. Boswell* (1986), 148 Ill. App. 3d 915[, 500 N.E.2d 116]; *Beauchamp v. Elrod* (1985), 137 Ill. App. 3d 208[, 484 N.E.2d 817].) 'Because of the summary nature of extradition proceedings, the scope of inquiry surrounding extradition proceedings does not include the kind of preliminary inquiry traditionally intervening between initial arrest and trial.' *Beauchamp*, 137 Ill. App. 3d at 210. See also *Michigan v. Doran* (1978), 439 U.S. 282, 288, 58 L. Ed. 3d 521, 527, 99 S. Ct. 530, 535." *Young*, 153 Ill. 2d at 403.

Even though the defendant in *Young* asserted in open court during his extradition hearing that he wished to assert his sixth amendment rights, and defendant's court-appointed attorney asserted the same thing, the supreme court went on to state that an extradition hearing does not mark the beginning of adversary judicial proceedings and that, consequently, the sixth amendment right to counsel had not yet attached. (*Young*, 153 Ill. 2d at 406.) The motion to suppress in that case was therefore improperly granted, and the defendant's confession, made after an extradition hearing at which the defendant was represented by counsel but before indictment or the filing of the criminal complaint, should have been admitted into evidence.

In *People v. Maust* (1991), 216 Ill. App. 3d 173, 576 N.E.2d 965, on the other hand, the defendant was indicted before extradition. There, as here, the sixth amendment right to counsel had attached. In that case, however, the defendant waived extradition in writing, but in his written waiver he unambiguously requested counsel in the underlying case. His subsequent waiver was ineffective, and the circuit court's suppression of his confession was proper. *Maust*, 216 Ill. App. 3d at 183-84.

In *People v. Lynch* (1992), 234 Ill. App. 3d 141, 599 N.E.2d 1202, *appeal denied* (1992), 147 Ill. 2d 633, 606 N.E.2d 1232, as in *Young*, the defendant had not been indicted, but a complaint for preliminary examination had been filed against him by a police detective. The

appellate court held, first, that since the complaint was not filed with significant involvement of the prosecution, its filing did not cause the attachment of his sixth amendment right to counsel; and, second, that the extradition proceeding also did not cause attachment of the sixth amendment right to counsel. (*Lynch*, 234 Ill. App. 3d at 146.) His confession was thus wrongly suppressed by the circuit court.

In *Quadrini v. Clusen* (7th Cir. 1989), 864 F.2d 577, the court found no invocation of the right to counsel where the defendant showed police the public defender's and public defender investigator's business cards, and told them that the public defender had advised him not to make a statement. The defendant made a statement anyway during a police-initiated interview, after commencement of formal adversary proceedings. The court held that the repeated reading of the defendant's *Miranda* rights, and his unambiguous waiver of them, effected a valid waiver under *Patterson v. Illinois*. The court also noted that the defendant's comments evidenced his clear understanding of the sixth amendment right and his full intention to waive it. *Quadrini*, 864 F.2d at 582-87.

In *People v. Lane* (1993), 256 Ill. App. 3d 83, the defendant was indicted and later extradited from Italy. When he sought to suppress a statement he made to Illinois authorities after being informed of his *Miranda* rights and agreeing to waive them, the circuit court denied his motion, even though he had been represented by counsel in the Italian extradition hearing, and even though he had made the general statement that he intended to "get a lawyer" upon his return to the United States. The appellate court affirmed, holding that he had not invoked his attached sixth amendment right to counsel. *Lane*, 256 Ill. App. 3d at 51-55.

There is no case that is directly on point on the issue presented in this case. Here, defendant's sixth amendment right to counsel had attached, and he had accepted counsel in an extradition hearing. His extradition counsel had advised him of his right to counsel during police questioning, but he still waived his rights and spoke with the law enforcement officials. Was his attached right to counsel invoked by his acceptance of counsel in the extradition hearing?

*Dicta* in *Lynch* suggests that it was not. As in this case, in *Lynch* the defendant accepted appointed counsel in his extradition hearing. The court suggested that even if the defendant's sixth amendment right had attached in that case, which it had not, the defendant had not invoked his right by accepting counsel in the extradition proceeding prior to his valid waiver. (*Lynch*, 234 Ill. App. 3d at 149-50.) The circumstances of *Lynch* are sufficiently distinguishable from those in *Maust*, where the right to counsel had attached and the de-

fendant made a written request for counsel when he waived extradition.

■ Our holding today solidifies the *dicta* in *Lynch* and extends the holding of the supreme court in *Young*. We hold that even though defendant's sixth amendment right to counsel had attached by virtue of his indictment, his mere acceptance of counsel for the extradition hearing was insufficient to invoke that right, his waiver of the right was effective, and the circuit court properly denied his motion to suppress.[1]

## II

Defendant next argues that the circuit court erred by excluding Tim Anderson's testimony.

"A defendant has the right to prove any fact or circumstances tending to show that someone else committed the crime. [Citation.] This right is limited by the further rule that the evidence offered may not be speculative, irrelevant or immaterial." (*People v. Luigs* (1981), 96 Ill. App. 3d 700, 706, 421 N.E.2d 961.)

Testimony is relevant if it would, if believed, tend to make any fact in issue more or less probable than it would be without the testimony. (*People v. Gonzalez* (1991), 142 Ill. 2d 481, 487-88, 568 N.E.2d 864.) Evidence is speculative if the finder of fact would need to engage in substantial speculation to connect the facts to which the witness has

---

[1]The United States Supreme Court held in the landmark case of *Chapman v. California* (1967), 386 U.S. 249, 17 L. Ed. 2d 705, 87 S. Ct. 824, that not all constitutional error requires reversal of a defendant's conviction. Since then, the Court has considered at least four cases involving sixth amendment right to counsel violations under harmless error analysis. (See *Satterwhite v. Texas* (1988), 486 U.S. 249, 100 L. Ed. 2d 284, 108 S. Ct. 1792; *Moore v. Illinois* (1977), 434 U.S. 220, 54 L. Ed. 2d 424, 98 S. Ct. 458; *Brown v. United States* (1973), 411 U.S. 223, 36 L. Ed. 2d 208, 93 S. Ct. 1565; *Milton v. Wainwright* (1972), 407 U.S. 371, 33 L. Ed. 2d 1, 92 S. Ct. 2174.) In *People v. Smith* (1982), 93 Ill. 2d 179, 442 N.E.2d 1325, the Illinois Supreme Court applied harmless error analysis to a sixth amendment right to counsel violation. Although statements taken in violation of a defendant's attached and invoked sixth amendment right to counsel will often be prejudicial if admitted, in this case we note that defendant was not prejudiced by the introduction of Quinn's testimony regarding the disputed interview. In fact, Quinn's testimony bolstered the alibi defense presented by defendant's sister, by giving the jury the information that defendant had previously asserted the same defense. Since defendant did not testify, there was no other way the jury could have received that information. Thus, even if the statement was deemed to have been obtained in violation of the sixth amendment, any error in its admission was harmless beyond a reasonable doubt.

testified to the matters at issue in the case. See *People v. King* (1978), 61 Ill. App. 3d 49, 377 N.E.2d 856.

Defense counsel stated in his offer of proof that Anderson would testify that on the night of October 19, 1988, he was with a man named Jay who drove to the Mobil station where this murder occurred, took an automatic gun from his pocket, and went into the station. A few minutes later, Anderson heard a shot and Jay returned to the car. The circuit court held that the evidence was remote and speculative and thus not relevant.

Although a defendant does not have a right to present evidence that a different person performed acts which are not closely related to the crime (see *King*, 61 Ill. App. 3d at 52), the acts which defendant sought to prove here were very closely related to the crime. The testimony would place Jay at the crime scene near the time of the murder with a gun of the kind used to kill Hoch. The testimony did not concern events remote in time or place, and jurors would not need to speculate to connect the shot Anderson said he heard to this crime. (See *People v. Wilson* (1986), 149 Ill. App. 3d 293, 500 N.E.2d 128, *appeal denied* (1987), 113 Ill. 2d 584, 505 N.E.2d 360; *People v. Boyd* (1980), 81 Ill. App. 3d 259, 263, 401 N.E.2d 304.) Although the circuit court has wide discretion for deciding whether evidence is relevant, the circuit court here failed to take adequate steps to determine relevance.

The circuit court's comments indicate that it relied on the impeachment evidence the State claimed to have. The State said that Anderson initially told police the event occurred in August 1988 and that Anderson was a psychiatric inpatient. These considerations do not render the proffered testimony more remote, speculative, or irrelevant; they render it less credible. A prior inconsistent statement does not destroy the relevance of proffered testimony. (*Walker v. Midwest Emery Freight Systems, Inc.* (1990), 200 Ill. App. 3d 790, 558 N.E.2d 470, *appeal denied* (1990), 135 Ill. 2d 567, 564 N.E.2d 849.) If it did, the State would have had no case to present here because both Hlinko and Shane Miller made prior statements completely inconsistent with their trial testimony.

The circuit court, by relying on the factors it cited, essentially determined that Anderson's proffered testimony was not sufficiently credible. However, it is well settled in Illinois that "[d]eterminations of credibility and weight given to the testimony of witnesses are exclusively within the province of the trier of fact." (*People v. Acklin* (1990), 208 Ill. App. 3d 616, 622, 567 N.E.2d 525, *appeal denied* (1990), 137 Ill. 2d 666, 571 N.E.2d 150.) Thus, the circuit court may have erred by keeping relevant evidence from the jury based on the court's impression of its credibility.

Although the circuit court said it was not making a competency determination, it also indicated that the possible problems with competency contributed to its decision to exclude the testimony. The fact that the witness spent time in a mental institution is insufficient to justify exclusion of his testimony for incompetence. (*People v. Cox* (1967), 87 Ill. App. 2d 243, 247, 230 N.E.2d 900.) The circuit court apparently recognized that it could not make any competency determination without seeing or hearing from the proposed witness.

"The determination of whether a witness is competent to testify is within the sound discretion of the trial court and may be arrived at either through preliminary inquiry or by observing the witness' demeanor and ability to testify during trial." *People v. Williams* (1991), 147 Ill. 2d 173, 212, 588 N.E.2d 983, *cert. denied* (1992), 506 U.S. 876, 121 L. Ed. 2d 156, 113 S. Ct. 218.

In *Williams* the defendant argued that the circuit court abused its discretion by failing to hold a preliminary inquiry in which it would have interviewed the key witness to determine whether she was competent. Our supreme court held that the circuit court did not abuse its discretion because the record, as a whole, indicated that the witness was competent, despite her lapses of memory and her history of psychiatric hospitalization. (*Williams*, 147 Ill. 2d at 212-13.) Here, the circuit court neither examined Anderson at a preliminary inquiry, nor observed his demeanor at trial, so the court had no basis for a competency determination.

■ We find that the circuit court here erred by failing to interview Anderson as a preliminary step to determine his competence and the relevance of his testimony. We therefore remand this case for such an inquiry. If both his competency and the relevance of his testimony are established, the circuit court is to grant defendant's motion for a new trial. If for some reason Anderson is unavailable, or unwilling, to participate in the inquiry, or if the circuit court finds him incompetent or his evidence irrelevant, we retain jurisdiction in this matter. We are empowered to do so by Supreme Court Rule 615(b)(2) (134 Ill. 2d R. 615(b)(2)). Further, "a reviewing court *** is not divested of jurisdiction until the parties' rights of appeal have been exhausted." *Jones v. Board of Fire & Police Commissioners* (1984), 127 Ill. App. 3d 793, 797, 469 N.E.2d 393, 397. See also *People v. Garrett* (1990), 139 Ill. 2d 189, 564 N.E.2d 784 (appellate court should remand for a *Batson* hearing but retain jurisdiction); *People v. Gaston* (1992), 227 Ill. App. 3d 486, 592 N.E.2d 131 (same).

III

Defendant finally contends that improper prosecutorial remarks

in closing argument deprived him of a fair trial. He argues that in closing argument the prosecutor commented on facts not in evidence, commented on defense counsel's failure to call alibi witnesses and failure to ask certain questions of other testifying witnesses, and improperly shifted the burden of proof. Defendant contends that the State's arguments prejudiced him and deprived him of his right to a fair trial.

The State in turn argues that all of the comments in the prosecutor's closing arguments about which defendant complains were based on the evidence or constituted legitimate inferences drawn from the evidence or were invited by the defense argument.

Prosecutorial arguments which exceed the boundaries of fairness and impartiality inherent in our system of adversary justice require reversal. (*People v. Beier* (1963), 29 Ill. 2d 511, 194 N.E.2d 280; *People v. Clark* (1983), 114 Ill. App. 3d 252, 448 N.E.2d 926; *People v. Starks* (1983), 116 Ill. App. 3d 384, 451 N.E.2d 1298, *appeal denied* (1983), 96 Ill. 2d 548.) Prosecutors, however, are afforded great latitude in closing argument. (*People v. Quiver* (1990), 205 Ill. App. 3d 1067, 563 N.E.2d 991.) Improprieties during closing argument warrant reversal only if they are so great as to prejudice the outcome of the trial. (*People v. Burrett* (1991), 216 Ill. App. 3d 185, 576 N.E.2d 293, *appeal denied* (1991), 141 Ill. 2d 547, 580 N.E.2d 121.) A reviewing court will affirm the conviction if the improper comments, considered singly or collectively, could not have prejudiced the defendant's right to a fair trial, in light of overwhelming evidence of the defendant's guilt. (*People v. Neumann* (1986), 148 Ill. App. 3d 362, 499 N.E.2d 487, *appeal denied* (1986), 113 Ill. 2d 581, 505 N.E.2d 359, *cert. denied* (1988), 481 U.S. 1051, 95 L. Ed. 2d 840, 107 S. Ct. 2184.) Further, a reviewing court will defer to the circuit court's determination of propriety in closing argument, absent a clear showing by defendant that the circuit court abused its discretion. *People v. Wright* (1991), 218 Ill. App. 3d 764, 578 N.E.2d 1090.

■ While defendant points to several instances in the record where the prosecutor supposedly referred to facts not in evidence, particularly in regard to the testimony of Hlinko, Shane Miller, and Martin, we find that the circuit court properly overruled defense objections during argument. Since the disputed comments arguably dealt with matters introduced in the testimony of the witnesses, defendant has failed to demonstrate that the circuit court abused its discretion in overruling the objections.

Further, defendant's contention that the prosecution's argument somehow impugned the integrity of defense counsel is not borne out by the record. When read in the context of the entire argument, it is

clear that the disputed comments were meant to stress the strength of the prosecution's case in light of the testimony of corroborative witnesses. Such comments are proper. *People v. Williams* (1990), 196 Ill. App. 3d 851, 554 N.E.2d 1040, *appeal denied* (1990), 133 Ill. 2d 570, 561 N.E.2d 705.

Finally, defendant's contention that the prosecution improperly shifted the burden of proof through comments in closing argument about nontestifying alibi witnesses also must be rejected. Illinois courts have held that a prosecutor may properly comment on the absence of testimony by an alibi witness whose name defendant injected into the case, as long as the prosecution does not rely on that failure to prove the offense. (*People v. Kubat* (1983), 94 Ill. 2d 437, 498, 447 N.E.2d 247, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 174, 104 S. Ct. 199; *People v. Williams* (1989), 185 Ill. App. 3d 1040, 542 N.E.2d 93.) Further, a great deal of difference exists "between an allegation by the prosecution that defendant did not prove himself innocent and statements questioning the relevance or credibility of a defendant's case." (*People v. Phillips* (1989), 127 Ill. 2d 499, 527, 538 N.E.2d 500, *cert. denied* (1990), 497 U.S. 1031, 111 L. Ed. 2d 798, 110 S. Ct. 3290.) In this case, the prosecutor explicitly stated that defendant had no burden to put on a defense. The prosecutor then questioned the incompleteness of defendant's theory, particularly because several close friends could have solidified certain aspects of the alibi but did not. The prosecutor in *Phillips* had questioned the unexplained aspects of the asserted defense theory, asking, "[i]f they had a good defense couldn't they come up with something better than that?" and commented that "[i]f they had anything better they would have put it on." (*Phillips*, 127 Ill. 2d at 526.) If the prosecutor in *Phillips* did not impermissibly shift the burden of proof, and the Illinois Supreme Court held that he did not, then the prosecutor here did not do so either.

For the reasons given, we remand for the indicated preliminary inquiry concerning the proffered witness Tim Anderson. We retain jurisdiction for the purpose of reviewing the circuit court's determination following that hearing, if the circuit court does not grant a new trial. Defendant and the State will be allowed to submit supplemental briefs addressing the issue in this court. See *People v. Jones* (1988), 177 Ill. App. 3d 663, 669, 532 N.E.2d 543.

Remanded with instructions.

SCARIANO, J., concurs.

JUSTICE McCORMICK, concurring in part and dissenting in part:

I concur in the majority's ruling that this case must be remanded for a hearing to determine Anderson's competence to testify. On all other issues, I dissent.

In section I of the opinion, the majority acknowledges the need for clear rules for law enforcement officials and courts to apply for determining whether police are permitted to question a suspect. The majority does not attempt to formulate a general rule still valid after this case which straightforwardly applies to most situations. Apparently persons applying this decision are to use the rule formulated in *Michigan v. Jackson*, as refined by later decisions, which hold that when a defendant invokes his right to counsel for proceedings on a criminal charge after his sixth amendment right to counsel has attached for that charge, police are not permitted to initiate any further questioning of the defendant related to that charge, and any subsequent waiver the defendant makes in interrogation on that charge is invalid. (*Michigan v. Jackson*, 475 U.S. at 636, 89 L. Ed. 2d at 642, 106 S. Ct. at 1411; *People v. Jackson*, 198 Ill. App. 3d at 843.) The majority today adds the qualification that invocation of the right to counsel for an extradition hearing on a criminal charge does not constitute an invocation of the right to counsel for any other purposes on that charge. The majority offers no guidance for what other proceedings on a criminal charge may be like extradition, so that invocation of the right to counsel for those proceedings would not constitute an invocation of the right to counsel for any other proceedings on that charge. Law enforcement officers and courts are left to guess the reach of the decision announced today.

The majority observes that the precise argument defendant advances on his first issue has not been decided in prior cases. (263 Ill. App. 3d at 69.) The majority then adopts the *dicta* from *Lynch*, without giving any persuasive reason for doing so. The majority suggests that because "extradition proceedings on the charges" (263 Ill. App. 3d at 67) do not constitute "a part of the underlying criminal prosecution" (263 Ill. App. 3d at 67) on those charges, invocation of the right to counsel for extradition proceedings on criminal charges does not constitute invocation of the right to counsel for any other proceedings on those charges. The majority does not explain how this holding can be reconciled with the direction in *Michigan v. Jackson* that we, the judges of this country's courts, are to "give a broad, rather than a narrow, interpretation to a defendant's request for counsel—we presume that the defendant requests the lawyer's services at every critical stage of the prosecution." (*Michigan v. Jackson*,

475 U.S. at 633, 89 L. Ed. 2d at 640, 106 S. Ct. at 1409.) On that basis the Supreme Court said: "We thus reject the State's suggestion that respondents' requests for the appointment of counsel should be construed to apply only to representation in formal legal proceedings." *Michigan v. Jackson*, 475 U.S. at 633, 89 L. Ed. 2d at 640-41, 106 S. Ct. at 1409.

The majority points out that some of the constitutional implications of extradition proceedings are distinct from the constitutional implications of other court proceedings on criminal charges. (263 Ill. App. 3d at 67-68.) Extradition proceedings are, however, as the majority tacitly acknowledges, part of the proceedings in court on criminal charges. The Uniform Criminal Extradition Act (725 ILCS 225/1 *et seq.* (West 1992); Ind. Code § 35—33—10—3) requires the State demanding extradition to attach to its demand an authenticated copy of the indictment or other charging document which must charge the person to be extradited with a crime under the laws of the State demanding extradition. (725 ILCS 225/3 (West 1992).) Where the document fails to charge a crime the extradition fails. (*People ex rel. Rukavina v. Sain* (1961), 22 Ill. 2d 546, 548-49, 177 N.E.2d 110.) Thus, extradition proceedings are part of the formal legal proceedings on the criminal charge.

I would find that the clearest rule consistent with prior case law and the presumption restated in *Michigan v. Jackson* is that when a defendant invokes his right to counsel for any proceedings on a criminal charge after his sixth amendment right to counsel has attached for that charge, police are not permitted to initiate any further questioning of the defendant related to the charge, and any subsequent waiver defendant makes in interrogation on that charge initiated by police is invalid. I would not make the rule hinge on the majority's distinction between the parts of the criminal prosecution and other legal proceedings on the criminal charge. Nor would I make a special exception for extradition proceedings.

Under the rule I propose defendant invoked his right to counsel for all proceedings on this charge by accepting representation by counsel for the extradition hearing on this charge. Therefore, his subsequent waiver of counsel during interrogation initiated by police was invalid, and his statement to the police should have been suppressed. Because of the extensive use the prosecutor made of this statement in closing argument and the closely balanced evidence in this case, I would find that the improper admission of the statement into evidence could have affected the verdict, so the case must be remanded for retrial without the improperly admitted evidence. See *People v. Graham* (1989), 179 Ill. App. 3d 496, 508-09, 534 N.E.2d

1382; *People v. Hoddenbach* (1983), 116 Ill. App. 3d 57, 61, 452 N.E.2d 32.

On the second issue, the majority finds that the trial court "failed to take adequate steps to determine relevance" of Anderson's testimony. (263 Ill. App. 3d at 71.) The trial court here listened to defense counsel's offer of proof that Anderson would testify that on October 19, 1988, he met Brandon, Brian and Jay in an apartment, and Jay said, "let's go get some money." They got in Brandon's car and went to the Mobil station in Calumet City. Jay carried a large dark automatic handgun into the station. A few minutes later Anderson heard one loud shot, then Jay came back to the car and recocked his gun.

Our supreme court ruled:

> "[A]n adequate offer of proof is made if counsel makes known to the trial court, with particularity, the substance of the witness' anticipated answer. [Citation.] An offer of proof that merely summarizes the witness' testimony in a conclusory manner is inadequate. *** The offer serves no purpose if it does not demonstrate, both to the trial court and to reviewing courts, the admissibility of the testimony." (*People v. Andrews* (1992), 146 Ill. 2d 413, 421, 588 N.E.2d 1126.)

Thus, counsel may apprise the court of the substance of the testimony in an adequate offer of proof, as long as the offer includes sufficient detail for the courts to determine whether it is admissible.

The trial court did not err by attempting to determine the relevance of the testimony on the basis of the detailed facts presented by defense counsel's offer of proof. The court erred only in its assessment of relevance. As the majority admits, "[t]he testimony would place Jay at the crime scene near the time of the murder with a gun of the kind used to kill Hoch. The testimony did not concern events remote in time or place, and jurors would not need to speculate to connect the shot Anderson said he heard to this crime." (263 Ill. App. 3d at 71.) This is quite sufficient to establish relevance. When witnesses have presented similar testimony on the State's behalf, courts have found the evidence very relevant, and prosecutors have argued that such testimony alone is overwhelming evidence of a defendant's guilt. See, *e.g.*, *People v. Saunders* (1991), 220 Ill. App. 3d 647, 658-59, 669, 580 N.E.2d 1246.

The majority correctly observes that impeachment evidence the State offered goes only to the weight, not the relevance or admissibility on any other grounds, of the evidence. The court had an adequate basis for determining relevance, but it abused its discretion by holding the evidence irrelevant. (*Wilson*, 149 Ill. App. 3d 293, 500

N.E.2d 128.) On remand I would direct the court to determine Anderson's competence to testify. The court could, in its discretion, take evidence concerning the relevance of Anderson's testimony, but I would not order it to do so.

The majority finally holds that the prosecutor made no improper remarks, although the majority also cites law that even improper remarks will not be grounds for reversal if the remarks were not likely to have affected the result "in light of overwhelming evidence of the defendant's guilt." (263 Ill. App. 3d at 73.) The majority stops short of applying the rule to this case, as it does not hold that the evidence here was overwhelming. Nonetheless, the statement of law pertinent to cases with such overwhelming evidence appears to be the sole reason for the majority's extended recitation of extraordinarily detailed facts which have no bearing at all on the majority's resolution of the first two issues in this case, and little relevance to the final issue if the majority relies solely on its apparent holding that the prosecutor's remarks were proper.

The evidence in this case is far from overwhelming. The State's case hinged largely on the credibility of Hlinko's testimony at trial, which was inconsistent with all of his many pretrial statements, some of which he made under oath.

On March 2, 1989, police arrested Todd Hlinko for selling narcotics. Hlinko was then on probation for aggravated battery. After eight hours of questioning Hlinko signed a document stating that he, Sam Ilich, and defendant drove John Miller's car to the Mobil station on October 19, 1988, and defendant went into the station alone. They drove back to defendant's family's home, where both Hlinko and defendant lived. At the house Hlinko saw that defendant had a purse. Defendant said it belonged to a girl named Sam. Defendant kept the purse by his bed that night. Hlinko told several people, including his mother and his attorney, that he signed the statement because police beat him.

Police arrested Hlinko again on March 16, 1989, and asked him whether his statements of March 2 were true. Hlinko first said they were true. Some hours later he said that the statement he gave on March 2 was false. Hlinko claimed that he had stayed home while defendant went out with some people Hlinko did not know. Hlinko next told police that he, defendant and Ilich drove to the Mobil station, but he stayed in the car while they went in. They drove around, and defendant and Ilich threw things out of the car. Hlinko did not see a purse. They dropped Ilich off at his home before returning to defendant's home.

Hlinko wrote to defendant on April 28, 1989, while defendant

was in jail in Indiana, that the police beat Hlinko and gave him a black eye. He apologized to defendant for lying to police about defendant on March 2 and March 16. Hlinko later signed an affidavit in which he swore that the statements he made to police on March 2 and March 16 were false, and he made the statements because of police threats and abuse. When he told police that he did not know about the murder, they beat him until he signed the statements they wanted.

Hlinko did not come up with the story which he told, under oath, at trial until the State began his prosecution of the narcotics charge. The State tried Hlinko first on the charge of violating probation based on the sale of narcotics. Hlinko knew that the court could sentence him for two to five years' imprisonment on the charge. Without any agreement with the State, Hlinko pleaded guilty to violation of probation. The court sentenced him to five years' imprisonment. The State next proceeded on the charge of selling narcotics, for which the court could sentence Hlinko to a term of 4 to 15 years' imprisonment. Prosecutors offered Hlinko a sentence of no more than eight years' imprisonment on the narcotics charge in exchange for testimony against defendant, but the prosecutors would not ask the court to make the eight years' imprisonment concurrent with the term for violating probation. Hlinko refused the deal. Hlinko and defendant stayed in the Cook County Department of Corrections pending trial. Hlinko wrote a note to defendant on July 2, 1990, telling him that prosecutors asked him to lie and testify against defendant in a trial for murder.

By this time a jury had acquitted Ilich on all charges related to the murder and armed robbery. Prosecutors realized that they might wind up with no convictions for a brutal crime which attracted considerable local publicity if they could not strengthen the case against one of the remaining defendants. In October 1990 prosecutors offered Hlinko, in exchange for his testimony against defendant, five years on the narcotics charge, concurrent with the probation violation, and the State would drop the armed robbery and murder charges. Hlinko agreed.

The majority points out that at defendant's trial Hlinko testified that he rejected the State's initial offer out of loyalty to defendant. His subsequent acceptance of the better offer shows the price for that loyalty. The State could not procure Hlinko's testimony solely by agreeing not to prosecute him for murder and armed robbery, although his new testimony would establish that he was involved closely with defendant at all stages of the crime. The State also needed to give Hlinko a deal on narcotics charges, for which Hlinko

had already pleaded guilty in probation revocation proceedings, so that under the deal Hlinko would serve not one day extra for the narcotics crime itself, although he faced a prison term of up 15 years' imprisonment on that charge. Hlinko admitted at trial that he had, throughout the investigation of this case, told many lies, some under oath, to try to avoid criminal liability. With the offer from the State, when he gave the testimony prosecutors wanted, he escaped all criminal liability for the murder, the armed robbery and the unrelated narcotics charge. The deal gave him a strong reason to lie and say that he knew something about the murder even if he knew nothing at all and faced no criminal liability for that crime.

Police were unable to verify any part of the information they obtained from Hlinko with any physical evidence. The police already had the purse before they spoke to Hlinko. Hlinko did not account for the purse appearing where Mainwaring found it in any of the stories he told before he cut the deal with prosecutors; then he testified that he saw defendant put the purse in a trash container in the same area where Mainwaring discovered it.

Police conducted a thorough search of the Calumet River near the bridge from which Hlinko said he threw the gun. The search spanned a large area and police uncovered several guns which were not used in this crime. Police were unable to find any gun which could have been used in this crime.

Neither could the fingerprint expert find any fingerprints on items in Hoch's purse to support Hlinko's story. She found 16 latent prints suitable for comparison on items in Hoch's purse. Eight prints belonged to Hoch. She testified that the remaining eight prints did not match the fingerprints of defendant, Ilich, Hlinko or Mainwaring. She made no further effort to determine who other than the victim, the defendant and his alleged cohorts, and the man who found the purse, left those eight fingerprints.

The State obtained some corroboration for Hlinko's testimony from Shane Miller, whose trial testimony matched his original statement to police. Shane Miller also swore in an affidavit that his original statement was all lies which he told police because they beat him. He testified at trial, under oath, that he did not read the affidavit retracting his original statement before signing it.

Although two of Shane Miller's statements are largely consistent with each other, they contradict Hlinko's testimony in several respects. Shane remembered going directly from his house to defendant's house; Hlinko remembered a stop at the Mobil station in between. Shane saw no one at the house; Hlinko remembered that they saw defendant's father. Shane said he went straight to

defendant's bedroom, and he has never used the bathroom in defendant's house; Hlinko said that Shane stopped to use the bathroom, and defendant first implicated himself when he was with only Hlinko in his bedroom. Brian Spodach also contradicted Shane's testimony that Spodach gave him a ride home.

Allen Martin also provided important corroboration for Hlinko's testimony, because only Martin and Hlinko said they saw defendant near the scene at the time of the crime. Martin testified that he saw Hlinko in the driver's seat of the car and waved. Martin admitted that Bill Ward, an attorney for defendant, asked him if he was Allen Martin because he wanted to speak to Martin about the case. Martin denied that he was Martin three times before finally admitting who he was. Ward testified that Martin told him he got into a fight with Hlinko and defendant at the Mobil station on October 19, 1988. Martin testified that he did not tell Ward he got into a fight at the station.

Martin's testimony contradicted Ward's and Hlinko's on most points. Martin said he waved to Hlinko, but Hlinko did not mention seeing Martin; Martin said Hlinko was driving, but Hlinko said defendant drove. The record also includes an indication that the register tape may have contradicted Martin's testimony that he made a purchase at the Mobil station.

The evidence in this case in many respects closely parallels the evidence in *People v. Williams* (1991), 147 Ill. 2d 173, 588 N.E.2d 983. In that case, Paula Gray testified before the grand jury that she was with the defendant when he shot the victims. At a preliminary hearing she recanted her entire grand jury testimony. She was indicted for participating in the murders and for perjury. At her trial she repeated her recantation of her grand jury testimony. She was convicted of murder and perjury, but she successfully appealed. (*Williams*, 147 Ill. 2d at 196-98.) On remand the State dropped the murder charges, and Gray testified for the State against defendant at his trial. Her testimony closely reflected her testimony before the grand jury. The court sentenced her to two years' probation for perjury. (*Williams*, 147 Ill. 2d at 198, 206-07.) Hlinko, like Gray, at first made statements implicating defendant, then, under oath, retracted those statements, and finally, in exchange for dismissal of the murder charge, testified against defendant.

Another witness in *Williams* testified that he saw defendant on the night of the murders in a group of people who went into the abandoned building where police later found one of the victims. When a crowd gathered to watch police investigating the crime scene, the defendant joined the crowd and the witness heard him make

statements implying that he participated in the crime. Martin, like the witness in *Williams*, placed defendant at the crime scene near the time of the crime. Shane Miller, also like that witness, heard the defendant make statements implicating himself in the crime. In this case, as in *Williams*, the prosecution presented no physical evidence tying defendant to the murder scene.

This case differs from *Williams* in three important respects. First, defendant here more extensively impeached all important witnesses for the State, and the principal witness here cut a much better deal than Gray, a deal which could have motivated him to falsely implicate himself in this crime to receive the benefit of no sentence for an unrelated crime. Second, defendant presented an alibi through largely consistent testimony of several witnesses. Third, police obtained exculpatory statements from defendant which, to some extent, undercut his alibi. Our supreme court found the evidence in *Williams* closely balanced. (*Williams*, 147 Ill. 2d at 223.) The State's case here is no stronger. Hlinko's testimony, like Gray's, is sufficient to support the conviction if the jury chose to believe it, but the evidence is closely balanced.

To tip the balance in their favor and obtain a conviction for this murder, the prosecutors made several remarks in closing argument which went beyond the bounds of acceptable comment on the evidence. The prosecutor argued that defendant failed to present "the nine people qualified" to support his alibi. Of the nine people defendant testified he saw at his sister's home on the night of the murder, defendant's sister, her ex-boyfriend, and Tony Rodriguez testified for defendant; Hlinko, his ex-girlfriend Lisa Majszak and her cousin Cory testified for the prosecution; and two of the remaining three were the small children for whom defendant baby-sat. Only one competent witness who could have corroborated defendant's alibi did not testify here, and that one was Manny Raices. The prosecutor misleadingly implied a far greater failure to present witnesses, apparently in the hope that with numerous witnesses giving lengthy testimony to inconsistent stories throughout trial, the jury would be unable to organize the precise evidence presented and would accept instead the prosecutor's implicit false assertion that many of the persons who defendant said he saw on the night of the murder were not called to testify.

The prosecutor further argued that defendant should have asked Pullyblank about the alibi, although the prosecutor conceded that, according to the alibi, Pullyblank remained passed out in Rodriguez's car while Rodriguez went into Kobak's home and talked to defendant. Defendant did present Pullyblank as a witness, and Pully-

blank's failure to remember the evening does not impeach defendant's alibi any more than it impeaches Hlinko's testimony that Pullyblank and his girlfriend came over to defendant's home late that night.

The prosecutor accused defense counsel of "trying to get [Shane Miller and Allen Martin] to change their testimony." The record contains no evidence that defendant or his counsel had any contact with Shane Miller regarding this case. Shane Miller testified that he signed the affidavit which was inconsistent with his trial testimony at the behest of Hlinko's mother. The State presented no basis for attributing Hlinko's mother's conduct to the defense here. The prosecutor apparently interpreted Bill Ward's proper attempt to interview a crucial witness, Allen Martin, as a highly improper attempt to get him to alter truthful testimony. A remark which " 'charge[s] counsel with fabrication of a defense bordering on subornation of perjury' [citation] is beyond the scope of allowable comment." (*Phillips*, 127 Ill. 2d at 525, quoting *People v. Emerson* (1983), 97 Ill. 2d 487, 499, 455 N.E.2d 41.) Arguments charging defense counsel with such "trickery tend to deprive the accused of a fair trial." *People v. Brown* (1983), 113 Ill. App. 3d 625, 630, 447 N.E.2d 1011.

In light of the closely balanced evidence, I cannot say that the prosecutor's remarks did not tip the balance in the State's favor. I would find the remarks another basis for reversal for retrial.